585 So.2d 816 (1991)
PRINCIPAL FINANCIAL GROUP, etc.
v.
Barbara Caroline THOMAS.
1900294.
Supreme Court of Alabama.
July 26, 1991.
*817 Lynn Etheridge Hare of Barker & Janecky, Birmingham, and Forrest S. Latta of Pierce, Carr & Alford, Mobile, for appellant.
Andrew T. Citrin and John T. Crowder, Jr. of Cunningham, Bounds, Yance, Crowder & Brown, Mobile, for appellee.
PER CURIAM.
See Thomas v. Principal Financial Group, 566 So.2d 735 (Ala.1990), in which we remanded and held that any consideration of the post-judgment motion filed by Principal Financial Group, d/b/a Principal Mutual Life Insurance Company ("Principal Mutual"), alleging that the $750,000 punitive damages award was excessive should be in accordance with Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).
Judge Douglas Johnstone conducted a thorough hearing pursuant to Hammond on the issue of punitive damages; and, in determining whether $750,000 exceeded an amount necessary to punish Principal Mutual and to deter it and others similarly situated from committing similar acts in the future, he considered the seven factors listed in Green Oil, 539 So.2d at 223-24, and compared the verdict with other jury verdicts in similar cases before concluding, in his thorough and scholarly opinion, that "the jury's verdict accomplishes the purposes and goals of punitive damages under Alabama law and is not excessive when viewed in light of the decisions of our Supreme Court in Hammond and Green Oil."
From a review of the trial court's findings and from our independent review of the evidence, applying the Green Oil standards, we conclude that the $750,000 punitive damages award in this case does not exceed an amount necessary to punish Principal Mutual for its action and to deter it and others similarly situated from committing similar acts in the future.
The amount of punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small; if grievous, the damages should be much greater.
Time and order is reversed; parents should not have to bury their children. But sometimes they have to. Against that day, that evil day, that a mother hopes will never come, she pays her mite to an insurance company. In the event that evil day comes, that mother's mite will provide the means with which to bury that child. That day does come, but the insurance company does not pay the amount of money that the mite was supposed to secure. Why? To determine why, 12 good jurors and true, men and women from the judicial circuit in which the event happened, were chosen as triers of the fact. After evaluating all of the evidence, these impartial jurors found that this amount was not paid because the insurance company's claims examiners intentionally and recklessly failed to subject the results of their investigation of the mother's claim to cognitive evaluation and review and found that the insurance company had no lawful basis for denying the mother's claim.
Is the actual harm slight or grievous? Grievous.
But the amount of life insurance was only $1,000. Yes, and the evidence shows that the out of pocket expenses incurred by the mother's lawyersnot their fees, but their out-of-pocket expenseswere $9,330.33 at the time of the Hammond hearing. The insurance company retains the $1,000; the insurance company refuses to pay this. How many lawyers will take this mother's case, knowing that they will have to pay more in out-of-pocket expenses *818 to recover this $1,000 than they will be paid if they recover the entire $1,000? How many mothers will forgo litigation because they will have nothing even if they are successful? How many mothers, with this dependent life insurance coverage, have buried their children and not received this coverage?
A lack of a means of litigating because the contract amount involved is too small to obtain lawyers who can afford to file suit to recover only the contract amount would potentially deprive an insured, who thinks her case is just, of her day in court. This may free insurance adjusters from fairly investigating and reviewing small claims and may result in a loss of faith in the judicial system. Is this likely harm slight or grievous? Grievous.
The amount of punitive damages should reflect the degree of reprehensibility of the defendant's conduct. The refusal to pay a claim that the finders of the fact determined was not paid because the insurance company's claims examiners intentionally and recklessly failed to properly investigate and evaluate that claim is at least moderately reprehensible. Although there is no evidence of it in this case, if there is evidence that an insurance company engages in a pattern or practice of refusing to pay any borderline claims involving small amounts (so small that it would be difficult for the insured to obtain an attorney to properly evaluate or handle the collection of those claims), that would be very reprehensible conduct.
The amount of punitive damages should be in excess of the profit made by the defendant through its wrongful conduct. From every indication, the award much more than removes the profit in this case.
In determining the excessiveness vel non of punitive damages, the Court must consider the financial condition of the defendant. The following appears in Judge Johnstone's excellent order:
"According to its answers to plaintiff's post-remand interrogatories, defendant has no liability insurance available to pay the judgment entered against it in this case. Defendant's answers to the interrogatories indicate that the entire liability will be paid by the defendant, Principal Financial Group D/B/A Principal Mutual Life Insurance Company. At the post-remand evidentiary hearing, it was revealed that Principal Mutual's assets and profits are measured in billions of dollars. The parties offered into evidence the annual reports for the Principal Financial Group for the years 1986, 1987, 1988, and 1989. After reviewing this extensive financial information, and hearing the arguments of counsel for both sides, the trial court finds that the jury's verdict will have a minor impact on the defendant. Payment of the jury's verdict will certainly not impose economic hardship on the defendant."
Clearly, all of the costs of litigation would be more than adequately covered by the punitive damages awarded in this case.
No criminal sanctions or other punitive damages have been imposed upon Principal Mutual for the conduct made the basis of this action. Therefore, factors (6) and (7) listed in Green Oil do not mitigate the punitive damages award in this case.
We concur with Judge Johnstone in the holding that the $750,000 punitive damages award in this case is not excessive.
The other issues raised by Principal Mutual have been resolved by Pacific Mutual Life Ins. Co. v. Haslip, ___ U.S. ___, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), and United American Insurance Co. v. Brumley, 542 So.2d 1231 (Ala.1989).
The judgment of the trial court is affirmed.
AFFIRMED.
HORNSBY, C.J., and ADAMS and INGRAM, JJ., concur.
ALMON and KENNEDY, JJ., concur in the result.
SHORES, HOUSTON and STEAGALL, JJ., concur specially.
MADDOX, J., dissents.
*819 HOUSTON, Justice (concurring specially).
I concur fully in the per curiam opinion; however, I write specially because I do not believe that Ms. Thomas should be entitled to receive the full award of punitive damages in this case.
The jury awarded Ms. Thomas only $1,000 as compensatory damages. This is clear from a thorough review of the record in this case, including the trial court's oral charge to the jury. Is Ms. Thomas entitled to receive the entire $750,000 in punitive damages awarded to her by the jury?
Justice Shores, in her special concurrence in Fuller v. Preferred Risk Life Insurance Co., 577 So.2d 878, 886 (Ala. 1991), wrote:
"I believe that much of the criticism surrounding the issue of punitive damages is due to the perception on the part of the public that punitive damages awards sometimes amount to an undeserved windfall to the prevailing plaintiff. I believe it is true that sometimes an award does constitute an undeserved windfall to the plaintiff, but this fact has no bearing on the question of whether the award exceeds an amount appropriate to punish the defendant for the wrong committed and to deter others from similar conduct in the future.... If the court concludes that the amount is not so excessive as to deprive the defendant of his property in contravention of § 13, Ala. Constitution 1901, it nevertheless may also determine that it would be in the best interest of justice to require the plaintiff to accept less than all of the amount and to require the defendant to devote a part of the amount to such purposes as the court may determine would best serve the goals for which punitive damages are allowed in the first place: vindication of the public and deterrence to the defendant and to others who might commit similar wrongs in the future. In such cases, the court has the discretion to order the defendant to devote a portion or all of the amount to efforts to eliminate the conditions that caused the plaintiff's injury.
"In my opinion, the court may also order the defendant to pay part of the award either to the state general fund or to some special fund that serves a public purpose or advances the cause of justice....
"... The courts ... have inherent authority to allocate punitive damages, with jurisdiction over both plaintiff and defendant, by reducing the amount that the plaintiff is to receive to less than the full amount of the verdict, and directing the defendant to pay a part of a punitive damages award to the state general fund or any special fund devoted to the furtherance of justice on behalf of all the people. To do so in proper cases could serve the purpose for which punitive damages were authorized to a greater degree than would allowing the plaintiff to receive the entire amount."
Under the circumstances of this case, I think that Ms. Thomas should receive $250,000 of the punitive damages award; and that the general fund of the state should receive $500,000, the balance of the punitive damages award. It is due to the efforts of Ms. Thomas's attorneys that the public interest has been served. Therefore, I would hold that 1/3 of the expenses incurred in the litigation and 1/3 of the attorney fees in accordance with the contract with Ms. Thomas should be paid to Ms. Thomas's attorneys out of the $250,000 of the punitive damages allocated to Ms. Thomas. The balance of the $250,000 and all compensatory damages, in my opinion, should be paid to Ms. Thomas. Furthermore, I would hold that 2/3 of the expenses incurred in the litigation and 2/3 of the attorney fees based upon the employment contract between Ms. Thomas and her attorneys (a copy of the contract would need to be filed with the trial court) should be deducted from the $500,000 and paid to Ms. Thomas's attorneys; and the balance should be forwarded to the treasurer of the State of Alabama to be deposited in the general fund of the state.
The compensatory damages and the out-of-pocket expenses awarded to Ms. Thomas in this case were $1,000. The punitive damages were $750,000. A 750 to 1 ratio *820 of punitive damages to compensatory damages and out-of-pocket expenses.
With regard to the amount of punitive damages that may be awarded, I do not know where the line was drawn by the majority opinion in Pacific Mutual Life Insurance Co. v. Haslip, ___ U.S. ___, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), between "the constitutionally acceptable and the constitutionally unacceptable" in a given case. ___ U.S. at ___; 111 S.Ct. at 1043. Before concluding, the majority in Haslip wrote:
"We are aware that the punitive damages award in this case is more than 4 times the amount of compensatory damages, is more than 200 times the out-of-pocket expenses of respondent Haslip.... While the monetary comparisons are wide and, indeed, may be close to the line, the award here did not lack objective criteria."
___ U.S. at ___; 111 S.Ct. at 1046.
I do not know whether this indicates that there must be some kind of proportionality between compensatory damages and punitive damages. I would trust that it does not, if the jury is charged as it was in Haslip and if the trial court conducts a hearing in accordance with Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), and evaluates the case by the seven factors listed in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and if this Court conducts an appropriate review. In the majority opinion in Haslip (___ U.S. at ___, 111 S.Ct. at 1040-45), the terms "windfall recovery" and "windfall" are used; the use of those terms indicates a concern that the amount received by the plaintiff as a result of the punishment of the defendant may be too great. Justice Shores aptly expressed this concern in Fuller. Therefore, I would reduce the amount the plaintiff is to receive to some figure more closely corresponding to the 200 to 1 punitive damages to out-of-pocket expenses ratio that existed in Haslip, and direct that the remainder of the punitive damages after expenses and attorney fees be paid to the State of Alabama general fund to be used for the public good.
SHORES and STEAGALL, JJ., concur.
MADDOX, Justice (dissenting).
On original deliverance, I expressed in a dissenting opinion (566 So.2d at 750) why I thought the trial judge was correct in granting the insurer's motion for a judgment notwithstanding the verdict on the bad faith claim. As I pointed out then, and point out again, the insurer is being fined for failing to win the legal debate over whether the policy language was ambiguous, a legal issue the record in this case shows was involved in this case from the beginning. The statement of the facts in the original opinion (Thomas v. Principal Financial Group, 566 So.2d 735 (Ala. 1990)) shows, without dispute, that the company and the person entitled to the benefits were debating the question of whether the deceased young lady was a "dependent" within the meaning of the policy.
The issue of whether the deceased young lady was "attending school on a full-time basis," the policy language defining a covered dependent, continued to be debated. The issue was tried to a jury, and the trial judge, finding that the policy language, at least under the facts of this case, was ambiguous, allowed the coverage issue to go to a jury. The coverage issue was debated by the parties at oral argument of the case, in the parties' briefs, and in the written opinion issued by this Court, and as I pointed out in a special concurrence on the question, it was a close question whether the company was entitled to a directed verdict on the contract claim.[1]
*821 It would be neither helpful nor persuasive to restate what I have already said in my original dissent concerning the question of whether the bad faith claim should have gone to a jury. The trial judge, applying the law of bad faith extant at the time, thought that it should not have. He granted the company's motion for a judgment notwithstanding the verdict. I thought he was right. See my dissent, 566 So.2d at 750.
The law of bad faith refusal to pay first-party insurance claims has been troubling. I expressed some of the concerns that I had in a lengthy dissent in Continental Assur. Co. v. Kountz, 461 So.2d 802 (Ala. 1984), in which I noted that this Court should probably consider expanding the rule of law relating to the recovery of contractual damages in noncommercial insurance contract cases. In a footnote to that case, I suggested that the legislature might wish to address the problem.
Mr. Justice Jones, in a special concurrence in the Kountz case said, "I think it appropriate, here, to caution the reader that neither [Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala. 1987)] nor the instant case should be read as weakening the application of the directed verdict test in a bad faith claim context." 461 So.2d at 810. The opinion released today, it appears to me, does great violence to that test. In one portion of the opinion, the majority states: "After evaluating all of the evidence, these impartial jurors ... found that the insurance company had no lawful basis for denying the mother's claim." This statement implies, if it does not hold, that an insurance company had better win any legal debate it has with its policyholder or suffer a penalty in such a size as the jury may impose. Whether this company had a "lawful basis" to deny the claim was not determined until this Court held in its first opinion in this case that a jury question was presented on the breach of contract claim. See Thomas v. Principal Financial Group, 566 So.2d 735, 739 (Ala.1990), in which the majority stated that "[t]he words `attending school on a full-time basis' are not patently ambiguous" (emphasis added).
The majority also refers to the "mother's mite," "lack of a means of litigating because the contract amount is too small to obtain lawyers," and "borderline claims." These statements, while arguably relevant to a determination of the reasonable expectancies of the parties in this insurance contract setting, seem to suggest that a jury's award of punitive damages can be sustained by a showing that these facts are present. When the tort of bad faith was first adopted, this Court seemed to stress the importance of the "directed verdict" test. It appears to me that the "directed verdict" test has been modified.
*822 This Court is frequently asked to review disputes between a policyholder and an insurer over such terms as "resident of the same household" and other terms in a policy. Although I agreed that the company was not entitled to a directed verdict on the contract claim in this case, I still believe that the trial judge was eminently correct in granting the insurer's motion for a judgment notwithstanding the verdict on the bad faith claim, because that was what the law of bad faith required, as I understood it at the time. That is why I suggest that this opinion changes the rules. For this Court to authorize the recovery of $750,000 against this company because it did not pay this claim, when this Court itself says that the words of the policy"attending school on a full-time basis"are not "patently ambiguous," and the obligation to pay was not established until this Court heard the case on appeal, shows that the "directed verdict" test has been substantially weakened, and I think that this Court's consideration of such factors as the "mother's mite" and the "lack of a means of litigating because the contract amount is too small to obtain lawyers,"[2] is inappropriate in the context of the legal question whether the deceased child was "attending school on a full-time basis," a term this Court found was not "patently ambiguous." Whether the child was covered or not covered was a legal question, and the wealth of the policyholder and the size of the policy should have been irrelevant in answering that legal question, which was not answered until long after the jury had made its award. What if the policyholder was a billionaire and the policy was in the sum of $1 million? Would that change the nature of the legal question whether the deceased child was "attending school as a full-time student," or whether the issue was a debatable one? Clearly the answer is "no."
Although I concurred in resolving another bad faith case, Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala.1987), in which this Court required the insurer to pay extra contractual damages, I cannot agree that this case is similar to Aetna. In that case, this Court had previously refused to uphold a summary judgment issued in favor of the company on the bad faith claim, and noted that "this court has not foreclosed the possibility of recovery in tort for the bad faith refusal of an insurer to pay legitimate benefits due under an insurance policy." Lavoie v. Aetna Life & Cas. Co., 374 So.2d 310, 312 (Ala.1979). Here, it seems clear to me that there was a debatable issue from the very start.
Based on the foregoing, I think that the opinion issued today, on return to remand, is wrong; consequently, I must dissent.
Having expressed the reasons why I disagree with the majority opinion, I also am compelled to state my disagreement with Mr. Justice Houston's special concurrence, in which he states that this Court has the power to direct that a portion of the punitive damages should "be forwarded to the treasurer of the State of Alabama to be deposited in the general fund of the state." While I do not necessarily disagree with the principle that the legislature might enact legislation to have a portion of punitive damages awards in civil cases paid to the state, I do not believe this Court, by judicial decree, can accomplish it.
NOTES
[1] There is no question that the deceased was not "attending school on a full-time basis," at the time of her death, and that she had not done so for many months prior to her death. The majority discussed this question in its opinion initially:

"The words `attending school on a full-time basis' are not patently ambiguous; that is, on their face they are clear and intelligible and suggest but a single meaning. `Attending' is the present participle of `attend.' `Attend' is defined in The American Heritage Dictionary of the English Language (1969) as `to be present at: attend class.' `Full-time,' used in the policy as an adjective, defined in The Random House Dictionary of the English Language (1971) as `working or operating the customary number of hours in each day, week, or month.' Thus, the words `attending school on a full-time basis,' at least on their face, envision presence in school for the normal or standard period of time required. If this were the end of our inquiry, we would be compelled to hold the trial court in error for denying Principal Mutual's motions for a directed verdict and judgment notwithstanding the verdict, because the undisputed evidence showed that Ms. Warren was not attending school at the Mobile Academy at the time of her death and had not been doing so for approximately 18 months prior thereto....
"The record in this present case reveals that the policy in question was a life insurance policy that was payable upon the death of a `dependent,' whether death was the result of an accident or of an illness.... [A] manual used by Principal Mutual's claims examiner stated: `All policy provisions shall be interpreted in accordance with the common understanding of their language. The spirit or intent of the provision as distinguished from a narrow interpretation of the language shall be given effect;' [and the record reveals] that Edward Kahalley, Jr., an insurance consultant and administrator with over 20 years of experience in interpreting group insurance policies, and with knowledge of the practices and customs of the insurance industry, gave undisputed testimony as an expert that Ms. Warren would have been considered a `dependent' within the meaning of the policy by all other insurers within the industry because she was rendered physically incapable of attending school by a debilitating illness that eventually caused her death...."
566 So.2d at 739.
[2] This Court has provided a simplified procedure for persons to prosecute small claims such as this in the district court. See, Rule 21, A.R.J.A.