646 So.2d 619 (1994)
BMW OF NORTH AMERICA, INC.
v.
Ira GORE, Jr.
BAYERISCHE MOTOREN WERKE, A.G.
v.
Ira GORE, Jr.
1920324, 1920325.
Supreme Court of Alabama.
August 19, 1994.
Certiorari Granted January 23, 1995.
*620 Michael C. Quillen and Samuel M. Hill of Walston, Stabler, Wells, Anderson & Bains, Birmingham, for appellants.
Andrew L. Frey and Evan M. Tager of Mayer, Brown & Platt, Washington, DC, for BMW of North America, Inc.
Michael A. Epstein, Steven Alan Reiss and Beth K. Neelman of Weil, Gotshal & Manges, New York City, for Bayerische Motoren Werke, A.G.
Andrew W. Bolt II, Paula I. Cobia and Stephen K. Wollstein of Bolt, Isom, Jackson and Bailey, Anniston, and John W. Haley and Bruce J. McKee of Hare, Wynn, Newell & Newton, Birmingham, for appellee.
C. Clay Torbert III of Capell, Howard, Knabe & Cobbs, P.A., Montgomery, for amicus curiae Alabama Development Office in support of appellants.
Hobart A. McWhorter, Jr., Linda A. Friedman and John E. Goodman of Bradley, Arant, Rose & White, Birmingham, and Charles A. Newman and Lawrence C. Friedman of Thompson & Mitchell, St. Louis, MO, for amici curiae American Auto. Mfrs. Ass'n, Inc., and Ass'n of Intern. Auto. Mfrs., Inc.
Fourier J. Gale III of Maynard, Cooper & Gale, P.C. and S. Allen Baker, Jr. of Balch & Bingham, Birmingham, for amicus curiae *621 Business Council of Alabama, in support of appellants.
Certiorari Granted January 23, 1995. See 115 S.Ct. 932.

On Application for Rehearing
PER CURIAM.
The opinion released October 29, 1993, is hereby withdrawn and the following opinion is substituted therefor.
The primary issues presented by these appeals are (1) whether a German automobile manufacturer had sufficient contacts with Alabama to permit the courts of this state to exercise personal jurisdiction over it, and (2) whether a jury's award of $4,000,000 in punitive damages against the manufacturer and its distributor is excessive.
The appeals are by BMW of North America, Inc. ("BMW NA"), and Bayerische Motoren Werke, Aktiengesellschaft ("BMW AG") from a judgment entered on a jury verdict awarding the plaintiff, Dr. Ira Gore, Jr., compensatory damages of $4,000 and punitive damages of $4,000,000. The specific issues presented in regard to the excessiveness question are: (1) Whether punitive damages were properly assessed, and, if so, whether the amount of the award is excessive; and (2) whether, without evidence that any state other than Alabama requires disclosure of minor cosmetic repairs by a manufacturer, the trial court erred in admitting evidence that BMW NA had sold 983 vehicles throughout the country that had incurred damage similar to that incurred by Gore's automobile and that had been repaired without BMW NA's disclosing that it had made repairs.
As to BMW NA, we have considered the oral arguments of the parties and the briefs of the parties and the amicus curiae briefs, and we have reviewed the verdict according to the principles set out in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), and TXO Production Corp. v. Alliance Resources Corp., ___ U.S. ___, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). After thoroughly and carefully reviewing the record and verdict, considering the gravity of the wrong and the nature and extent of the injury inflicted upon the plaintiff, and comparing the punitive damages award in this case with other awards allowed in similar cases involving the sale of automobiles, we hold that the trial court's order denying BMW NA's motion for a new trial is due to be affirmed on the condition that the plaintiff file with this Court within 21 days a remittitur of damages of $2,000,000. Otherwise, the judgment will be reversed and this cause remanded for a new trial.

Facts
The plaintiff, Dr. Ira Gore, Jr., bought a new 1990 BMW 535i automobile from German Auto, Inc., a Birmingham dealership, for $40,750.88. He had no direct dealings with either BMW AG or BMW NA. At the time of the sale, Dr. Gore, a graduate of Harvard College and Duke Medical School, signed a "Retail Buyers Order" and an "Acknowledgement of Disclosure" in which he acknowledged that the automobile might have sustained damage at some point and that he had inspected it and had agreed to accept it. This disclosure form did not list the repair that is the subject of this action. Gore drove the car for approximately nine months before taking it to "Slick Finish," an independent automobile detailing shop, to make the car look "snazzier than it normally would appear," even though he was not unsatisfied with the car's appearance and had not noticed any flaws in the finish on the car.
The detailer informed Gore that the car had been partially refinished; Gore later determined that the refinishing had been done because of acid rain damage to the car's paint finish sustained during transit between BMW AG's manufacturing plant in Germany and BMW NA's vehicle preparation center in Brunswick, Georgia. BMW NA, the American distributor of BMW automobiles, had adopted a company policy that it would not disclose any damage to a dealer or to a customer if the cost of repairing the damage was less than three percent of the manufacturer's suggested retail price (MSRP). The cost of refinishing Gore's automobile was $601, less than three percent of the MSRP; consequently, BMW NA did not disclose that the automobile had been refinished. The jury found that the damage devalued the car *622 by $4,000 or about 10 percent of the price paid by Gore.
Upon his discovery that the automobile had been refinished, Gore sued German Auto, BMW AG, and BMW NA, alleging that the failure to disclose the refinishing constituted fraud, suppression of a material fact, and breach of contract. With respect to the BMW defendants, only the suppression claim was submitted to the jury. The jury returned a verdict against all three defendants for $4,000 in compensatory damages, and it assessed $4,000,000 in punitive damages against the BMW defendants jointly, based on a determination that the BMW defendants had been guilty of gross, malicious, intentional, and wanton fraud. The trial court entered a judgment on that verdict and subsequently denied post-judgment motions filed by the BMW defendants, after reviewing the verdict under the Hammond and Green Oil standards. The BMW defendants appealed.

I
First, we address the contentions of BMW AG. BMW AG is the German manufacturer of BMW automobiles, including Gore's 1990 BMW 535i. BMW AG does not sell automobiles directly to consumers. It sells automobiles in Germany to distributors, including BMW NA. The distributors then sell the automobiles to authorized BMW dealers, who in turn sell the automobiles to the ultimate consumers. BMW AG is a separate legal entity from BMW NA. BMW AG relinquishes all ownership, control, and liability for the automobiles it manufactures when it sells them to distributors such as BMW NA.
BMW AG argues that it is a foreign corporation, entirely separate from BMW NA, and that it lacks sufficient contacts with Alabama to allow Alabama courts to exercise personal jurisdiction over it. BMW AG also argues that Gore's automobile had become the property of BMW NA long before any refinishing or other repairs were performed.
It is undisputed that BMW AG did not know of BMW NA's three percent damage disclosure policy, and there was no evidence presented to show a legal relationship between BMW AG and BMW NA that would support a finding that BMW AG had such contacts with Alabama that it would be "fair and reasonable to require [BMW AG] to come to this state to defend [this] action." Rule 4.2(a)(2)(I), Ala.R.Civ.P. In Ex parte Pope Chevrolet, Inc., 555 So.2d 109 (Ala. 1989), this Court discussed at length the tests to be applied when applying the provisions of Rule 4, and there adopted what could be called the "purposeful availment" and "stream of commerce" tests in applying the minimum contacts rule, following the principles stated in World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).
Based on our examination of the applicable law, and in view of the particular facts and circumstances of this case, we find insufficient evidence to support a finding that BMW AG was the alter ego of BMW NA or that it knowingly and intentionally suppressed any fact upon which Gore's claim was based. We need not address whether BMW AG, if the facts were different, could be subject to suit in Alabama. We conclude, therefore, that BMW AG did not have such contacts with the State of Alabama that it would be fair and reasonable to require it to come to this state and defend against this particular action. The trial court should have granted BMW AG's motions to dismiss, for a directed verdict, and for a J.N.O.V. We, therefore, reverse the judgment as to BMW AG and enter a judgment for that defendant.[1]

II
We now consider the arguments of BMW NA. It first argues that there is no evidence, much less "clear and convincing evidence that [BMW NA] consciously or deliberately engaged in oppression, fraud, wantonness or malice with regard to the plaintiff," as required by Ala.Code 1975, § 6-11-20, to assess punitive damages. BMW NA contends that it presented substantial evidence *623 of a good faith belief that refinished vehicles suffer no diminution in value. BMW NA also argues that the three percent standard for nondisclosure of defects is customary in the automobile manufacturing industry and that it adopted this standard so that it would be in compliance with various state laws defining what constitutes sufficient damage to a new vehicle that the manufacturer, distributor, or dealer would be obligated to disclose under the provisions of consumer protection laws.
Alabama had no such law at the time of the events giving rise to this action, but during its 1993 Regular Session, the Alabama Legislature enacted Act No. 93-203, Ala.Acts 1993, which the Governor signed into law, to require manufacturers to disclose those repairs costing more than the greater of $500 or three percent of the MSRP:
"c. For purposes of this section, `material damage' means damage sustained or incurred by a motor vehicle, whether corrected or uncorrected, which cost to repair exceeds three percent of the manufacturer's suggested retail price of the vehicle based upon the dealer's retail repair cost or the sum of $500, whichever is greater. Damage to tires, glass, bumpers, and in-dash audio equipment shall not be considered in determining the cost of repair if those components are replaced by identical manufacturer's original equipment. The failure of a manufacturer, importer, distributor, or motor vehicle dealer to give notice of damage below the threshold constituting `material damage' shall not provide grounds for revocation of the sale nor shall such failure constitute a material misrepresentation or omission of fact."
Ala.Code 1975, § 8-19-5. We cannot agree with BMW NA's arguments. The public policy of Alabama expressed in the statute had not been enacted at the time BMW NA adopted its policy of nondisclosure. After considering the evidence in the record, we conclude that there was sufficient evidence for the jury to find that BMW NA intentionally and willfully suppressed the fact that the automobile had been repaired.[2]

III
We next discuss BMW NA's claim that the trial court erred in admitting evidence that BMW NA had sold 983 vehicles throughout the United States without disclosing that it had refinished them. BMW NA contends that "a false representation which is not a fraud is not admissible in evidence under a rule which renders similar frauds admissible as proof of the fraud charged." 37 Am.Jur.2d Fraud and Deceit § 456, at 629-30 (1968). BMW NA claims that it is entitled to a new trial, as was granted in Courtesy Ford Sales, Inc. v. Clark, 425 So.2d 1075 (Ala.1983), because of the admission of evidence of other sales by the defendant. BMW NA argues that, at most, only 14 of the 983 sales were in Alabama, and that there was no evidence presented to indicate that the sales made in other states would have been fraudulent or wrongful. On the contrary, BMW NA contends that most of those sales were not fraudulent under applicable state law.
Gore responds to this argument by saying that whether the trial court should have granted a new trial is largely discretionary and that the evidence that 983 vehicles were refinished and sold to customers without disclosing the repair was highly relevant and material. The record shows that the parties stipulated that 983 vehicles were refinished, but they dispute whether there was a proper objection to the admission of this evidence. We review it on the assumption that there was a proper objection made.
It is apparent from an examination of the transcript that Gore's theory for the admissibility of the work orders for repair of other vehicles was "to aid Gore in meeting [his] burden of [proving] intent, willfulness, pattern, practice, for damage purposes." Gore also disputes BMW NA's claim that the Courtesy Ford case is dispositive of this issue, because, Gore argues, there was no evidence presented in that case to indicate that *624 the facts and circumstances surrounding the other sales were factually similar to those surrounding the sale at issue. We agree with Gore. We believe that the evidence in this case was sufficient to show that BMW NA, on 983 occasions, shipped new vehicles to dealers without disclosing to the dealers that the vehicles had been refinished. Consequently, we conclude that the trial court did not err by admitting these other instances in the trial of this case, even though the conduct might not have been fraudulent under the law of the other states.

IV
BMW NA's chief argument is that the punitive damages award is excessive when measured by the factors stated in Green Oil Co. v. Hornsby because: (1) the award of punitive damages is 1,000 times the award of compensatory damages and bears no reasonable relationship to the risk of harm, which is purely economic; (2) BMW NA's conduct was much less reprehensible than that of defendants in other cases in which juries made much smaller damages awards; (3) it did not profit from its nondisclosure, because German Auto paid full price for the car; (4) the fact that it has a substantial net worth does not alone justify an exorbitant award; and (5) Gore never tried to resolve the matter without resorting to litigation.
In Green Oil, this Court commented on the purpose of punitive damages and set out some of the factors that the trial court should consider in reviewing a punitive damages award that the defendant claims is excessive. Regarding the purpose of punitive damages, the Court said:
"Because the purpose of punitive damages is not to compensate the plaintiff but to punish the wrongdoer and to deter the wrongdoer and others from committing similar wrongs in the future, the proper amount of punitive damages rests largely within the jury's discretion. However, although punitive damages need bear no particular relationship to actual damages, they, nonetheless, must not exceed an amount that will accomplish society's goals of punishment and deterrence. Maryland Casualty Co. v. Tiffin, 537 So.2d 469 (Ala. 1988); City Bank of Alabama v. Eskridge, [521 So.2d 931 (Ala.1988)]; Roberson v. Ammons, 477 So.2d 957 (Ala.1985)."
539 So.2d at 222.
This Court also stated in Green Oil:
"`The following could be taken into consideration by the trial court in determining whether the jury award of punitive damages is excessive or inadequate:
"`(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.
"`(2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or `cover-up' of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.
"`(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.
"`(4) The financial position of the defendant would be relevant.
"`(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.
"`(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.
"`(7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award.'"
539 So.2d at 538-39 (quoting Aetna Life Insurance Co. v. Lavoie, 505 So.2d 1050, 1062 (Ala.1987) (Houston, J., concurring specially)).
*625 We now review the jury verdict and the judgment entered by the trial court with those factors in mind, saving for last a discussion of whether the punitive damages award bears a reasonable relationship to the harm actually caused or likely to be caused by the defendant.

The Reprehensibility of the Defendant's Conduct
In determining the degree of reprehensibility of BMW NA's conduct, we have considered the duration of that conduct, the degree of BMW NA's awareness of any hazard that its conduct caused or was likely to cause, any concealment or "cover-up" of that hazard, and the existence and frequency of similar past conduct. All are relevant in determining the degree of reprehensibility.
BMW NA argues that there is no evidence that its adoption of the nondisclosure policy was "gross, oppressive or malicious." It says that it adopted the nondisclosure policy in good faith and it presented evidence that it followed industry custom in the nondisclosure of repairs such as those involved in this case. Gore, on the other hand, contends that BMW NA consciously adopted the nondisclosure policy at a time when it knew that the law of 35 states would have required disclosure of this material fact. As this case shows, this jury and another jury thought the "cost of repair" policy did not correspond with actual diminution in value.
The evidence shows that BMW adopted the policy of nondisclosure in 1983 and that the policy applied to the sale of all automobiles in all states. Based on this evidence, we conclude that Gore satisfactorily proved that BMW NA engaged in a pattern and practice of knowingly failing to disclose damage to new cars, even though the damage affected their value, and that BMW NA followed this policy for several years. Based on that evidence, we conclude the Gore satisfied the burden placed on him to show that BMW NA's conduct was reprehensible.

Was the Conduct Profitable to BMW NA?
The next issue we address is whether the conduct was profitable to BMW NA. The evidence shows that it was. In fact, the jury awarded Gore $4,000 in compensatory damages.
One of the purposes for assessing punitive damages is to remove the profit resulting from a fraud or misrepresentation. Punitive damages should be in excess of the profit, so that the wrongdoer recognizes a loss. We find that the evidence was legally sufficient to withstand a directed verdict motion; therefore, it was a jury question whether that evidence produced "in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion"; see Ala.Code 1975, § 6-11-20(b)(4).

The Financial Position of BMW NA
It is clear from the evidence that the $4 million judgment would not have a substantial impact upon BMW NA's financial position.

The Costs of the Litigation
In reviewing whether a particular punitive damages award is excessive, the public policy of this state is to consider the costs of litigation and to encourage plaintiffs to bring wrongdoers to trial. See, e.g., Smith v. States General Life Ins. Co., 592 So.2d 1021 (Ala.1992). In our review of this verdict we have considered the fact that the costs associated with this trial were substantial. We have given due consideration to that fact, in keeping with our application of the Hammond and Green Oil factors.

Criminal Sanctions
If criminal sanctions have been imposed on the defendant for the conduct made the basis for the award of punitive damages, Hammond and Green Oil require that this fact be taken into account in mitigation of the punitive damages award. No criminal sanctions have been imposed on BMW NA for this conduct.[3]

Other Civil Actions
If there have been other civil actions against the same defendant, based on the same conduct, this fact should be taken into *626 account in mitigation of the punitive damages award. BMW NA, in an appendix to its brief, states that Gore's counsel in this case has filed 24 other actions against BMW NA in Alabama and Georgia.[4] In one of those actions, Yates v. BMW of North America, Inc., 642 So.2d 937 (Ala.Civ.App.), cert. quashed, 642 So.2d 937, the case was tried by a jury in the same circuit in which this case was tried, but that jury, while awarding a similar amount of compensatory damages, awarded zero punitive damages.
In Yates, the purchaser was a doctor, as here. In Yates, the jury heard evidence of BMW NA's policy of nondisclosure and of the number of vehicles sold throughout the United States that had had some repair work done on them before they were sold as new automobiles. However, in Yates, the jury, although it received similar instructions on the issue of punitive damages, awarded none.[5] This Court views the disparity between the two jury verdicts$4 million in punitive damages in this case, and $0 in the Yates caseas a reflection of the inherent uncertainty of the trial process and a result of the fact that the cases were tried differently to different juries and at different times. Despite similarities, the trial in Yates was not identical to the trial in the case before us. The conclusions reached by 12 different persons upon hearing different evidence that was argued differently cannot dictate the conclusion of the jury in this case.

The Reasonable Relationship Factor
Did the punitive damages award bear a reasonable relationship to the harm that was likely to occur from the defendant's conduct *627 as well as to the harm that actually occurred? Was the actual or likely harm slight, or was it grievous?
It seems apparent from the record that the jury's punitive damages award is based upon a multiplication of $4,000 (the diminution in value of the Gore vehicle) times 1,000 (approximately the number of refinished vehicles sold in the United States).
Gore's counsel specifically argued the following during closing:
"They've taken advantage of nine hundred other people on those cars that were worth more.... If what Mr. Cox said is true, they have profited some four million dollars on those automobiles. Four million dollars in profits that they have made that were wrongfully taken from people. That's wrong, ladies and gentlemen. They ought not be permitted to keep that. You ought to do something about it.
"....
"I urge each and every one of you and hope that each and every one of you has the courage to do something about it. Because, ladies and gentlemen, I ask you to return a verdict of four million dollars in this case to stop it."
Based on these facts and the testimony taken at the post-trial hearing on the excessiveness issue, we must conclude that the award of punitive damages was based in large part on conduct that happened in other jurisdictions. This, BMW NA argues, is a violation of BMW's due process rights and encroaches upon the sovereignty of other states. See, Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Although evidence of similar acts in other jurisdictions is admissible as to the issue of a "pattern and practice" of such acts, see part III, supra, this jury could not use the number of similar acts that a defendant has committed in other jurisdictions as a multiplier when determining the dollar amount of a punitive damages award. Such evidence may not be considered in setting the size of the civil penalty, because neither the jury nor the trial court had evidence before it showing in which states the conduct was wrongful.[6]
This Court has recognized that evidence of adherence to industry practice bears importance on the question whether the defendant has acted in good faith and is therefore not subject to exemplary damages. Thomas v. Principal Financial Group, 566 So.2d 735 (Ala.1990); Richerzhagen v. National Home Life Assurance Co. of New York, 523 So.2d 344 (Ala.1988).
This Court has also held that a manufacturer that in good faith repairs a vehicle to "new" specifications should not be found to have engaged in the type of conduct giving rise to punitive damages. Ford Motor Co. v. Burkett, 494 So.2d 416 (Ala.1986). This Court has further held that a vehicle with superficial cosmetic damage, including scratches in the paint and unmatched and uneven paint, was "new" as a matter of law, and on that holding affirmed a judgment based on a directed verdict against a plaintiff claiming fraud. Wilburn v. Larry Savage Chevrolet, Inc., 477 So.2d 384 (Ala.1985). While reviewing the verdict in this case, we have considered the principles of law contained in these other Alabama cases.
*628 In defending the jury's punitive damages award, Gore argues that the harm is "likely to occur" in the future if the substantial award is not upheld, because the policy of nondisclosure was not changed before the verdict in this case was returned, even though BMW NA had been faced with lawsuits and with requests by dealers that it change the policy. Gore contends that, because of the size of the award, "[f]ive days after this punitive damages verdict, BMW NA adopted a full disclosure policy." In arguing for enforcement of the total jury award, Gore likens the conduct here to that in TXO Production Corp. v. Alliance Resources Corp., ___ U.S. ___, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), where the United States Supreme Court considered whether a $10 million punitive damages award in a slander of title action was excessive when the actual damages verdict was only $19,000. The Supreme Court noted that "[w]hile [TXO] stresses the shocking disparity between the punitive award and the compensatory award, that shock dissipates when one considers the potential loss to [Alliance], in terms of reduced or eliminated royalties payments, had [TXO] succeeded in its illicit scheme." ___ U.S. at ___, 113 S.Ct. at 2722.
Likewise, we find a reasonable relationship between the jury's decision to award punitive damages and the number of times BMW NA had engaged in similar conduct, and we find no error in the admission of the evidence that showed how pervasive the nondisclosure policy was and the intent behind BMW NA's adoption of it. However, as we discuss below, when applying the reasonable relationship test to the amount of punitive damages to be awarded in this case, we do not consider those acts that occurred in other jurisdictions.
As noted in Pacific Mut. Life Ins. Co. v. Haslip, supra, the constitutionality of Alabama's punitive damages law rests, in part, on this Court's use of comparative analysis during judicial review of a punitive damages award. Further, although in TXO Production Corp. v. Alliance Resources Corp., supra, the Supreme Court refused to embrace the comparative analysis method as the sole means for review of a punitive damages award, it noted that analysis was one of the relevant factors to be considered in a review of punitive damages awards.
Accordingly, in reviewing the punitive damages award in this case, we have considered cases from this state, along with cases from other jurisdictions, involving the sale of an automobile where the seller misrepresented the condition of the vehicle and the jury awarded punitive damages to the purchaser. Although we find the use of comparison cases helpful in determining whether a jury's punitive damages award is excessive in relation to the defendant's conduct, we note that such an analysis is but one step in applying the Green Oil factors and is not a substitute for the use of all those factors. We emphasize that the use of an enhanced comparative analysis does not create, and is not intended to create, a mathematical formula incorporating other jury verdicts to produce a readily calculable figure for punitive damages.
As the United States Supreme Court stated in Haslip, "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." 499 U.S. at 18, 111 S.Ct. at 1043. Mathematical formulas simply cannot fit the requirement of case-by-case justice that is the cornerstone of our jury system.
The determination of a proper award of punitive damages ultimately turns on the jury's determination of the facts warranting their imposition. Our law governing this Court's deference to the jury's factfinding prerogative is long settled:
"When a jury is the trier of fact, it is not for the trial judge, nor an appellate court, to attempt to determine with mathematical certainty that all of the various elements of evidence offered by the parties regarding specific costs and credits precisely equal the amount of the jury's verdict. We do not have trial by computer, nor do we have post-trial, or appellate review by the computer. The reviewing court does not substitute *629 its own judgment as to the amount of damages for that of the trier of fact."
G.M. Mosley Contractors, Inc. v. Phillips, 487 So.2d 876, 879 (Ala.1986). See also Hollis v. Wyrosdick, 508 So.2d 704 (Ala.1987).
"Upon review of a jury verdict, we presume that the verdict was correct; we review the tendencies of the evidence most favorably to the prevailing party; and we indulge such reasonable inferences as the jury was free to draw from the evidence. We will not overturn a jury verdict unless the evidence against the verdict is so much more credible and convincing to the mind than the evidence supporting the verdict that it clearly indicates that the jury's verdict was wrong and unjust."
Campbell v. Burns, 512 So.2d 1341, 1343 (Ala.1987) (citation omitted). See also Ashbee v. Brock, 510 So.2d 214 (Ala.1987); and Jawad v. Granade, 497 So.2d 471 (Ala.1986). Taken in this light, a comparative analysis referencing analogous cases provides additional data to be considered in determining whether a particular award is constitutionally reasonable under the requirements of TXO, Haslip, Green Oil, and Hammond, supra.
After thoroughly and painstakingly reviewing this jury award in light of the factors discussed above, we hold that a constitutionally reasonable punitive damages award in this case is $2,000,000, and that a remittitur of the $4 million jury verdict is appropriate. Therefore, the trial court's order denying BMW NA's motion for a new trial is affirmed on the condition that the plaintiff file with this Court within 21 days a remittitur of damages in the sum of $2,000,000; otherwise, the judgment will be reversed and this cause remanded for a new trial as to the defendant BMW NA.
1920324ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED CONDITIONALLY; APPLICATION OVERRULED.
1920325ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND JUDGMENT RENDERED FOR DEFENDANT BMW AG; APPLICATION OVERRULED.
HORNSBY, C.J., and MADDOX, SHORES, STEAGALL, KENNEDY and INGRAM,[7] JJ., concur.
HOUSTON, J., concurs specially.
HOUSTON, Justice (concurring specially).
This Court has decided one previous case, American Honda Motor Co. v. Boyd, 475 So.2d 835 (Ala.1985), that has a fact pattern similar to that of this case and that is significant for comparative analysis. In American Honda, a Honda automobile that had its door damaged en route to the United States was sold as new by the dealer after the distributor had repaired the damage at the port of entry. 475 So.2d at 837. The purchasers were not informed of the car's condition before the purchase, but learned of the damage and repair only after the door began to rattle and operate improperly. This Court upheld a general verdict of $65,000, of which the probable punitive damages award was $64,400 (the maximum cost to properly repair the car was $600). Id. at 837-38. When adjusted for inflation, the $64,400 awarded in 1985 would equal approximately $85,000 today.
Inflation-adjusted punitive damages awards in the Alabama cases involving fraud in the sale of automobiles range from a low of $11,800[8] to a high of $162,637.[9] The range of inflation-adjusted punitive damages awards in comparable cases from other jurisdictions is similar to, although slightly wider than, the range in Alabama cases. The average inflation-adjusted punitive damages award for the Alabama comparison cases is not much different from the damages award in American Honda and is also close to the average of punitive damages awards from *630 comparison cases in other jurisdictions.[10] Consideration of the various awards in comparison cases does allow us to compare the award in this case with the upper ranges of awards in comparison cases. "In remitting a punitive damages award, we must remit only that amount in excess of the maximum amount that a properly functioning jury could have awarded." Big B, Inc. v. Cottingham, 634 So.2d 999 (Ala.1993).
Evidence was admitted indicating that BMW NA had sold 983 vehicles throughout the United States without disclosing that it had refinished them. We know that 14 of these vehicles were sold in Alabama, and there was evidence that these sales were fraudulent or wrongful. There was no showing of how many of the sales in other states were fraudulent or wrongful. Therefore, considering the evidence of these other sales, including the 14 instances of concealed repair in Alabama, I conclude that the actions or inactions of BMW NA in connection with these sales would support the majority's award of $2,000,000 in punitive damages.
In regard to Yates v. BMW of North America, Inc., 642 So.2d 937 (Ala.Civ.App. 1993), cert. quashed, 642 So.2d 937 (Ala. 1993), I can say only that a punitive damages award lies within the discretion of the jury. Even if the jury finds conduct that would allow it to assess punitive damages, it is not required to do so. Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993). Yates's case was tried before Gore's was tried; therefore, a failure to award punitive damages to Yates was not based upon BMW NA's having already been punished for this course of conduct by an award of punitive damages in Gore's case. Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Because evidence of BMW NA's pattern and practice was introduced in each case, an award of punitive damages in either case based upon this pattern and practice would sufficiently punish BMW NA for this conduct, and any additional punishment of BMW NA for this conduct would have serious problems under the United States and Alabama Constitutions. Some courts have refused to strike punitive damages awards merely because they constituted repetitive punishment for the same conduct. See, e.g., Dunn v. Hovic, 1 F.3d 1371, 1385 (3d Cir.1993). However, when a punitive damages award is obviously based upon the totality of a defendant's pattern and practice, as it is in this case (evidence that BMW NA sold 983 vehicles in this way; jury found a $4,000 compensable loss for the sale of one such vehicle; jury awarded $4,000,000 in punitive damages; this Court reviewed the punitive damages award and reduced it to $2,000,000), we have in effect held that punishment for this course of conduct by BMW NA in excess of $2,000,000, violates "some" substantive due process. I believe that to allow any additional punitive damages award against BMW NA in regard to the sale of any of the 983 vehicles may violate numerous constitutional rights. The jury has the discretion to award or not to award punitive damages. Therefore, we cannot tell whether Yates's jury did not find conduct that allowed it to assess punitive damages or that the jury, having the right to do so, refused to assess punitive damages, as its virtually uncontrollable discretion allowed it to do.
The Yates case and this case are almost identical. The same excellent lawyers represented Yates that represent Gore; the same excellent lawyers represented BMW NA in both cases. Excellent trial judges, in the same judicial circuit, conducted as nearly perfect trials as can be conducted. Each plaintiff was a member of a respected profession; each was a physician. BMW NA was the defendant in each case. How does Gore get $2,000,000 in punitive damages and Yates *631 get nothing in punitive damages? Different juries.
Perhaps Gore, Yates, BMW NA, the citizens of Alabama, and even this Justice will think that something is not rightthat, to paraphrase a Ray Stevens' song of several years ago, Gore got the gold mine and Yates got something else. However, no plaintiff has a right to punitive damages.
Justice Shores, in her special concurrence in Fuller v. Preferred Risk Life Insurance Co., 577 So.2d 878, 886 (Ala.1991), which Justice Steagall and I joined, suggested that a substantial portion of punitive damages awards, after attorney fees and expenses are deducted, be paid to the state general fund or to some special fund that serves a public purpose or advances the cause of justice.
Some Justices have continued to support the transfer of all punitive damages awards, after a deduction for attorney fees and expenses, to the state's general fund. See Principal Financial Group v. Thomas, 585 So.2d 816, 819-20 (Ala.1991); Southern Life & Health Insurance Co. v. Turner, 586 So.2d 854, 859 (Ala.1991); Union Mortgage Co. v. Barlow, 595 So.2d 1335, 1348 (Ala.1992).
In the name of all that is fair, I ask this Court, which has consistently held that plaintiffs have no right to punitive damages, to direct that all or a substantial portion of punitive damages awarded in civil cases, after deducting attorney fees and expenses of litigation, be paid to the state general fund or to some special fund that serves a public purpose or advances the cause of justice. If this is done, then the time-honored and constitutionally mandated right to trial by jury will not be perceived, insofar as punitive damages is concerned, as Alabama's lottery, as it is now perceived by so many.
NOTES
[1] Our holding as to BMW AG is consistent with the result reached in Yates v. BMW of North America, Inc., 642 So.2d 937 (Ala.Civ.App.), cert. quashed, 642 So.2d 937 (Ala.1993), involving the same defendants and almost identical facts, where BMW AG was dismissed as a defendant.
[2] In view of the jury finding that the value of the automobile was diminished by $4,000, and in view of the fact that a jury in Yates, awarded compensatory damages of $4,600, the three percent cost of repair may not have been a proper yardstick by which to measure whether a disclosure should be made.
[3] In Yates, see note 1, the jury awarded no punitive damages.
[4] Actions Filed by Gore's Counsel Against BMW NA:

Alabama
1. Yates v. BMW of North America, Inc., No. CV-90-2533 (Jefferson Cir. Ct., Apr. 6, 1990).
2. Gore v. Bayerische Motoren Werke A.G., No. CV-90-9658 (Jefferson Cir. Ct., Dec. 17, 1990).
3. Wilkinson v. Bayerische Motoren Werke A.G., No. CV-92-896 (Tuscaloosa Cir. Ct., July 23, 1992).
4. Goode v. BMW of North America, Inc., No. CV-92-6498 (Jefferson Cir. Ct., Aug. 13, 1992).
5. Barnes v. BMW of North America, Inc., No. CV-92-8683 (Jefferson Cir. Ct., Nov. 5, 1992).
6. Rutkowski v. BMW of North America, Inc., No. CV-92-241 (Coffee Cir. Ct., Nov. 17, 1992).
7. McGowin v. Bayerische Motoren Werke A.G., No. CV-92-3976 (Mobile Cir. Ct., Dec. 10, 1990).
8. Evans v. Bayerische Motoren Werke A.G., No. CV-92-3975 (Mobile Cir. Ct., Dec. 10, 1990).
9. Clark v. BMW of North America, Inc., No. CV-92-616 (Morgan Cir. Ct., Dec. 22, 1992).
10. Jones v. BMW of North America, Inc., No. CV-93-H-202-E (N.D.Ala.; removed Jan. 28, 1993).
Georgia
11. Lassiter v. Bayerische Motoren Werke A.G., No. CV-E-3990 (Fulton Cty.Super.Ct., July 28, 1992).
12. Lee v. Bayerische Motoren Werke A.G., No. CV-92-17709-18 (Cobb Cty.Super.Ct., Nov. 4, 1992).
13. Gershon v. Bayerische Motoren Werke A.G., No. CV-E-4119 (Fulton Cty.Super.Ct., Aug. 5, 1992).
14. Higgins v. Bayerische Motoren Werke A.G., No. 9216480-18 (Cobb Cty.Super.Ct., Sept. 17, 1992).
15. Rivers v. Bayerische Motoren Werke A.G., No. 92-7173-2 (DeKalb Cty.Super.Ct., July 6, 1992).
16. Dempsey v. Bayerische Motoren Werke A.G., No. SUP-92-CV-2007 (Clarke Cty.Super.Ct., Nov. 2, 1992).
17. Caller v. BMW of North America, Inc., No. 93vs67839B (Fulton Cty. State Ct., Jan. 15, 1993).
18. Fisher v. BMW of North America, Inc., No. 93vs67842F (Fulton Cty. State Ct., Jan. 15, 1993).
19. Harmon v. BMW of North America, Inc., No. 93vs67841C (Fulton Cty. State Ct., Jan. 15, 1993).
20. Kaufmann v. BMW of North America, Inc., No. 93vs67843H (Fulton Cty. State Ct., Jan. 15, 1993).
21. O'Dell v. BMW of North America, Inc., No. 93vs67847B (Fulton Cty. State Ct., Jan. 15, 1993).
22. Simmons v. BMW of North America, Inc., No. 93vs67844A (Fulton Cty. State Ct., Jan. 15, 1993).
23. Thornton v. BMW of North America, Inc., No. 93vs0067736 (Fulton Cty. State Ct., Jan. 15, 1993).
24. White v. BMW of North America, Inc., No. 93vs67846C (Fulton Cty. State Ct., Jan. 15, 1993).
25. Sehgal v. BMW of North America, Inc., No. 93vs67869 (Fulton Cty. State Ct., Jan. 21, 1993).
[5] The report of that case states the following:

"From the limited record before us, it appears that Yates simply introduced into evidence a bulk exhibit existing of 5,856 repair bills. The bills were introduced to show that BMW NA sold over 5,800 automobiles without disclosing that it had made repairs to them. The exhibit included repairs made over a ten-year period and included automobiles sold throughout the country."
Yates, 642 So.2d at 940.
[6] The only testimony touching the issue showed that approximately 60% of the vehicles that were refinished were sold in states where failure to disclose the repair was not an unfair trade practice. On direct examination, David Cordero, an employee of BMW NA, who represented BMW AG during the trial, testified as follows:

"Q. Did you take thedid you take the repair orders that were introduced or copies of the repair orders that were introduced at the trial of this case and attempt to using ausing BMW's computer system identify the location of the retail dealers who sold those vehicles?
"A. Yes, yes, we did.
"Q. Could you tell the Courtcould you identify by state those dealers?
"A. Based on what we did, yes, we could identify by state.
"Q. Do you recall approximately how many were in Alabama?
"A. I would say about 11 to 14, something like that.
"Q. And approximately how many of those repair orders were in states that had these statutes that have been introduced?
"A. I approximated about 60 percent of those repair orders were in states outside of Alabamanot outside of Alabama, but in those state statutesdisclosure statutes."
(Record at 971-72).
[7] Justice Ingram did not sit for the oral arguments, but he listened to the tape of the oral arguments.
[8] German Auto, Inc. v. Tamburello, 565 So.2d 238 (Ala.1990) (original punitive damages award of $10,815).
[9] Mobile Dodge, Inc. v. Alford, 487 So.2d 866 (Ala.1986) (general verdict of $125,000, treated as if the entire award was for punitive damages).
[10] In comparison cases from other jurisdictions, the amount of inflation-adjusted punitive damages was similar to that of the Alabama cases, ranging from approximately $12,000 (Mills v. Keith Marsh Chevrolet, Inc., 549 S.W.2d 604 (Mo. Ct.App.1977) (original punitive damages award of $5,000)) to approximately $196,000 (Douglas v. Ostermeier, 1 Cal.App.4th 729, 2 Cal.Rptr.2d 594 (Cal.Ct.App.1991) (original punitive damages award of $187,000)). The average inflation-adjusted punitive damages award in the comparison cases from other jurisdictions is approximately $71,000.