87 So.2d 439

**SOUTHERN STATES LIFE INSURANCE COMPANY**

v.

**L. G. ALLAN.**

6 Div. 70.

Court of Appeals of Alabama.

May 8, 1956.

Victor H. Smith, A. W. Jones and Pritchard, McCall & Jones, Birmingham, for appellant.

468

which defendant has failed or refused to pay to plaintiff, and which policies are still in force and effect, and for the sale of which plaintiff is entitled to renewal commissions for said period," etc.

The complaint was amended by increasing the sum sued for to $3,000.

Later, the complaint was further amended by adding counts 2 and 3.

Count 2 claimed $3,000 for breach of a written contract entered into between the plaintiff and defendant on, towit, May, 1950.

Count 3 claimed $5,000 damages for breach of a written agreement entered into between plaintiff and defendant on February 13, 1950.

The case was tried by the court without the intervention of a jury. Judgment was rendered for plaintiff in the sum of $337.70.

S. Palmer Keith, Jr., Birmingham, for appellee.

PRICE, Judge.

The complaint as originally filed contained two counts, count one claimed $1,000 for work and labor done by plaintiff for defendant from September, 1952, through December, 1953. Count two claimed $1,000 damages, "for that, on towit, September 1952, through December, 1953, plaintiff while a salesman and agent for defendant, sold insurance policies for defendant for the consideration of renewal commissions,

For the plaintiff C. O. McNees testified that he was district manager in Montgomery during February, 1950, and on April 1, 1950, he assumed the position of State manager for the company, and that he remained in defendant's employ until February, 1953.

Plaintiff introduced, as exhibit No. 1 to the witness' testimony, a contract between plaintiff and defendant, dated February 13, 1950, whereby plaintiff was appointed agent for defendant to solicit applications for insurance, and plaintiff agreed to act in such capacity. The commissions fixed were:

| "Description of Policy | First Month Premiums | Registration | Thereafter |
|---|---|---|---|
| "Hospital Policies (Individual) | 90% | 90% | 20% |
| "Health & Accident (Individual) | 90% | 90% | 20%" |

Section 3 provides:

"It is expressly agreed and understood that the party of the first part will pay commissions outlined under Section 2, so long as the party of the second part is actively engaged in soliciting applications exclusively for the party of the first part, and produces a minimum of $50.00 per month premium in accepted business. It is further agreed and understood that should the party of the second part leave the em-

ploy of the party of the first part, all renewal commissions will forfeit immediately to the party of the first part, unless the party of the second part secures a minimum of $3,000 in monthly renewal premiums, in which event this contract shall remain valid so long as the party of the second part maintains a minimum of $3,000 in monthly renewal premiums, subject to all of the provisions and conditions contained in this contract."

It was also provided that the contract might be terminated by either party by giving one day's notice to the other party.

The witness testified plaintiff worked under this contract until about the middle of May, 1950. When defendant company first started in Alabama in February, 1950, it assumed all the old contracts that Trans-Union and National Union had, as to commissions and renewals, but as the company became organized in May, 1950, it came out with a new contract, and witness was instructed that all agents operating in Alabama must convert to this contract or their employment would terminate as of the first of the month. All agents were required to post a surety bond, which had not been done under the old contract.

According to the witness, plaintiff signed the May, 1950, contract, and said contract was in the company's State office files in Birmingham when witness left defendant's employ; that he has not seen the contract since he left. Plaintiff then worked under the May contract and witness paid him his commissions and renewals were figured under this contract.

Witness stated he had seen the company records of payments, renewals and commissions for the years 1951, 1952 and 1953, and he could look at those records and tell what commissions were paid and what commissions were not paid. Under the new contract the company paid ten per cent renewal commissions; under the first contract they paid 20 per cent commission. The February contract called for 20 per cent renewals but they paid him ten per cent of his renewals.

Under the May, 1950, contract, the defendant has paid plaintiff in full up to November 1, 1953. For November and December of 1953, and January, 1954, defendant owes plaintiff $309.88, which is 50 per cent of his stated renewals, since he had left the company and was entitled to only 50 per cent under the contract.

In December of 1950, plaintiff left the company and remained away four to six months. The renewals were not paid to him from December, 1950, through the year of 1951. When plaintiff left defendant's employ he sold his renewals to the company for $400, and he was not entitled to renewals during the time he was not in the service of the company. The company did not reinstate the renewals on the payment of $400 by plaintiff. The records indicate that so far as new business is concerned, plaintiff, at the time he quit and after he quit, was being paid under the first contract.

From witness' investigation of the record, and his knowledge of the company affairs, he would say that defendant does not owe plaintiff any renewals for December, 1950, nor through the year 1951.

Witness stated on cross examination that all of the agents did not sign new contracts and they were not discharged, but he distinctly remembers that plaintiff signed this contract, and was given a copy of it. When plaintiff was re-employed in April, 1951, he did not sign another contract, but returned to work and operated under the contract of May, 1950. The company had no brokers.

The witness further said, from an examination of defendant's commission statements, the amount of money due to plaintiff by defendant under the February 13, 1950, contract was $3,211.96, and under the May 1950, contract the amount due would be $309.88, for the three months, up to February 1, 1954.

On re-cross examination the witness explained these figures in this way: "I say if you go by the new contract which I maintain the man worked under, we owe him the $309.00, but if you interpret he is working under the old contract and used

20 per cent renewal commission, the three thousand figure is right in my estimation."

Plaintiff's testimony was substantially the same as that of Mr. McNees. He testified that he was reinstated upon his return to the defendant's employ. At that time he was to begin drawing his renewals. The arrangements for his return to the company's employ were made by Mr. McNees, and Mr. Surrell, defendant's Vice-President. However, plaintiff did not immediately draw renewals after reinstatement but began to draw them during October, or November of 1951. After accounting for the failure to produce the original, an instrument, in blank, purporting to be a copy of the second contract between plaintiff and defendant, was identified as plaintiff's Exhibit 5. The provisions for the payment of commissions were:

| "First Mo. Prem. | Next 11 Mo. Prem. | First Quar. Prem. | Next 9 Mo. Prem. | First S.A. Prem. | Next 6 Mo. Prem. | First Ann. Prem. | Policy Fee | There-after |
|---|---|---|---|---|---|---|---|---|
| 80% | 15% | 55% | 15% | 35% | 15% | 30% | 100% | 10% |
| 80% | 15% | 55% | 15% | 35% | 15% | 30% | 100% | 10% |
| — | — | — | — | — | — | 45% | — | 20%." |

Section 3 provided:

"It is expressly agreed and understood that the party of the first part will pay commissions outlined under Section 2, so long as the party of the second part is actively engaged in soliciting applications exclusively for the party of the first part and produces a minimum of $50.00 per month premium in accepted business. It is further agreed and understood that should the party of the second part leave the employ of the party of the first part, during the first year of the party of the second part's employment, all renewal commissions will forfeit immediately to the party of the first part, unless the party of the second part secures a minimum of $3,000 in monthly renewal premiums, in which event this contract shall remain valid so long as the party of the second part maintains a minimum of $3,000.00 in monthly renewal premiums; should the party of the second part leave the employ of the party of the first part after a period of one year, all renewal commissions will be immediately reduced by fifty per cent and paid for a period equal to the time party of the second part has been in the employ of the party of the first part, subject to all of the provisions and conditions contained in this contract."

It was provided in Article 2, that: "* * * All previous communications between the parties hereto, verbal or written, are hereby abrogated and withdrawn, and this agreement when duly signed and approved constitutes the agreement between the parties hereto." Plaintiff testified that Exhibit 5 is an identical contract to the one he signed in May or June of 1950, and that he worked under this agreement. He also testified that defendant paid him both for new business and renewals from November, 1951, through October, 1953. He has received checks for renewal commissions for February and March of 1954, but has not been paid for the months of November and December of 1953, nor for January of 1954, and has not received any money from defendant company, other than those two checks, since October, 1953. When he resigned from the company he endorsed a check for $400, dated December 19, 1950, which read: "The cashing of this check releases the Southern States Life Insurance Company from any and all renewals due me now or may hereafter become due from said company and thereby transfers all said renewals to C. O. McNees." Whatever contracts he might have had were cancelled by his resignation, and he never made any other contracts at any time with defendant company.

On cross examination plaintiff stated that in June, 1951, he received a letter from Mr. Surrell, which stated that defendant had

purchased the renewals for $400, in good faith, and advising him that the writer had stated to Mr. McNees that they would entertain the idea of selling those renewals back to plaintiff after he had proven that he was going to work for the company without a lot of bickering, and if he wanted his renewals back he would be expected to continue with the company, produce a given volume of sound business, pay $400 in cash, plus a reasonable interest. Plaintiff testified he had no record of having paid the company the $400, but after the receipt of the letter he did not begin to draw renewals but got slips showing "credit on renewal commissions" on loans, and the $400 was interpreted as a loan when the company took him back. He also testified he had never received any of the renewals which he had sold to the company, and the renewals which he did receive did not include the renewals assigned under the $400 check, and that the company does not owe him for anything that took place before December 19, 1950. Plaintiff further testified that he did not at any time work as a broker.

Mr. Altshuter, District Manager for defendant in Birmingham, testified he was requested to try to find any and all contracts between plaintiff and defendant, and after diligent search "that is the only one I found right there."

Mr. R. E. Cowling testified he has been vice president of defendant company about five years and at all times when plaintiff was employed by it. He is familiar with the contract dated February 13, 1950, identified as "plaintiff's Exhibit 1"; that he knew of no other contract plaintiff had with defendant and had never heard of any other contract. That he had made diligent search in the Home office records to determine if there was any other contract than the one dated February 13, 1950, with Mr. Allan and did not find any other contract. That he was familiar with the statements rendered to plaintiff during the time he was operating as an agent or broker or in any way selling insurance for defendant. Copies of the statements were kept in the Home office, where they were made up. That as reflected by the statements and the checks which had been made to plaintiff, he had been paid all of the commissions due him under the contract he was operating under while selling insurance for defendant. Plaintiff began working under an agency contract February 13, 1950, and resigned from the company about the middle of December, 1950, and to his knowledge no other written contract was entered into between plaintiff and defendant. Plaintiff came back after he resigned in December, 1950, and sold insurance for the company as a broker. There was no written agreement of any kind. After he rejoined the company he was paid on the same basis as those paid on contracts which were currently being issued. The company had many other brokers. The defendant purchased plaintiff's renewals when he left the company in December, 1950, and he was paid renewal commissions beginning in April in accordance with the commission schedule used for brokerage agents on business being currently written, but these renewals were voluntarily paid and there was no contract in writing that specified the company was to pay those renewals to plaintiff.

The company credited plaintiff's account with renewals from June, 1951, or on the business that was released in the check and consigned to them, and paid him percentages of those premiums in accordance with the commission schedule of brokerage contracts and brokerage agreements he was working under at the time. That they did not have a written contract with plaintiff that would allow him to be paid renewals after he left the company. The provisions of the contract of February 13, 1950, pertaining to renewals should plaintiff leave the company contained three contingencies: one, if he dies; one, if he becomes disabled; and with two requirements based on those, one, that he produce a minimum of $50 per month, and the other, if, at the time of the termination of his contract of employment, he should have over $3,000 in monthy renewing premiums, he should receive renewals in accordance with the commission schedule in his contract for as long as the premium volume stayed above $3,000. Plaintiff did not maintain a renewal commission in the amount of $3,000 or above, and has not had since leaving the company.

Plaintiff left the company November 4, 1953, and all commissions due him until the time he left were paid in full.

The two checks sent to plaintiff after he resigned and which were introduced in evidence were definitely in error.

The witness McNees testified he had seen every one of these records of the payments and renewals and commissions for the years 1951, 1952 and 1953 and that he could look at those records and tell what commissions were paid and what commissions were not paid to plaintiff. He was asked the question, "under that contract (February, 1950) and going over these records and these statements, can you tell whether or not the company is indebted—whether or not the company has paid the plaintiff—." Objections were first sustained to this question and plaintiff's counsel stated he was asking for an interpretation of the records.

The records were then introduced in evidence, without objection, as plaintiff's exhibits 2 and 3, and certified to this court.

The court stated if the witness had been State Manager for three years and is familiar with the accounting he would let him give his judgment. Defendant objected to the witness testifying as to any accounting between the company and plaintiff.

The court stated further that he could not take the individual records, that it would be an indeterminable job, and if witness was State Manager and had personal knowledge of the records, he would permit him to give his judgment. The witness was then asked if he, after examining the records, could tell whether the company had paid plaintiff under the contract dated February 13, 1950. The witness answered that he had been paid under the new contract, and was paid ten per cent of the renewals under that contract.

The witness then stated on voir dire that he was with the company until February 1, 1953; that the checks were made out at the Home office in Houston and mailed to his office, and he made a check off on each of those checks paid and handed each check to plaintiff as it came in.

The witness stated that he could tell from his examination of the records what was paid and what was owing under the February, 1950 contract. He was then asked: "Will you do that, please, sir." The appellant's objection was overruled and an exception duly reserved. This is the basis for assignment of error No. 2. It is shown by the record that considerable time was given the witness to make the calculation.

Assignment of error 3 is based on the overruling of objection to this question propounded by plaintiff to the witness McNees: "Can you tell us whether or not the company has paid Mr. L. G. Allan in full under the May, 1950, contract from your examination?"

The witness McNees stated that he had computed the balance due for November, December, 1953, and January, 1954. Plaintiff then asked the question: "Will you give us that amount?" Appellant's objection was overruled, and exception reserved. This ruling of the court forms the basis of assignment of error 4. The witness answered: "The balance of his commission, taking this new contract we were operating under into consideration, for November, December and January, they owe him $309.-88."

Assignment of error 5 relates to the question propounded by plaintiff to the witness McNees: "From that examination tell the court the amount of money due under the February 13, 1950, contract to plaintiff by defendant. Appellant's objections were overruled, exception reserved, and witness answered, "$3,211.96."

Appellant insists that these questions called for the conclusion of the witness as to the ultimate fact to be determined and was invasive of the province of the court.

■ Aside from the fact that most of the objections interposed by defendant were general, Alabama Power Co. v. Thompson, 250 Ala. 7, 32 So.2d 795, 9 A.L.R.2d 974, we are of the opinion the rulings of the court were free from error.

In Sovereign Camp, W. O. W. v. Hoomes, 219 Ala. 560, 122 So. 636, 690, the

court cited innumerable authorities illustrating the general rule i. e. that a witness is not permitted to state conclusions of law, and its corollary: " ' "When the opinion is the mere short-hand rendering of the facts, then the opinion can be given, subject to cross-examination as to the facts on which it is based." ' "

In that case the court further stated:

" * * * the 'best evidence' rule is subject to well-recognized exceptions of which is, that where the originals consist of numerous documents which cannot be conveniently examined in court, 'and the fact to be proved is the general result of an examination of the whole collection,' in such case 'evidence may be given as to such result by any person who has examined the documents and who is skilled in such matters, provided the result is capable of being ascertained by calculation.' * * *

"In the cases where it is impracticable or impossible for the court to make an examination of a large number of instruments, entries, or records, a competent witness may make such examination and present his conclusions thereon to the court."

Here, as in the Hoomes case, supra, the question of the indebtedness vel non under the contracts was left to the court by the questions and answers. The witness was merely asked for a shorthand rendition of the result of his examination of the records, admitted without objection, and which could not be readily ascertained by the court by reason of the numerous records and entries.

■ It is a well settled principle that an insurance agent has no absolute right to renewal commissions. His right to such commissions depends upon the provisions of his contract. Himes v. Masonic Mut. Life Ass'n of District of Columbia, 215 Ala. 183, 110 So. 133.

■ It is equally well settled that the effect of rescission is to extinguish the contract. "The contract is annihilated so effectually that in contemplation of law it has never had any existence, even for the purpose of being broken. Accordingly, it has been said that a lawful rescission of an agreement puts an end to it for all purposes, not only to preclude the recovery of the contract price, but also to prevent the recovery of damages for breach of the contract." 6 R.C.L., Sec. 323, p. 942; Alabama Great Southern R. Co. v. Independent Oil Co., 230 Ala. 222, 160 So. 720.

■ However, after a contract has been rescinded it "may be renewed by express agreement or by acts evidencing such an intention". 17 C.J.S., Contracts, § 440, p. 925; W. H. Kirkland Co. v. King, 248 Ala. 643, 29 So.2d 141; Gillette v. Cashion, 21 N.J.Super. 511, 91 A.2d 421.

As a part of his assignment in brief that the judgment is not supported by the testimony, appellant insists "the testimony of the witness McNees grouped the three months of November and December, 1953, and January, 1954, in his statement as to the amount due plaintiff under the supposed contract. There was no effort to break down the amounts for any particular month. The action was commenced on January 26, 1954. Certainly no recovery could be had for commissions or premiums received after the suit was brought. For aught that the testimony of witness McNees showed, all or a large part of the figure he said was due became payable after January 26, 1954. The burden of separating the items was not on the defendant. Recovery cannot be had for sums not due when the action was commenced."

■■ The general rule is, "in cases, as this, where the evidence is ore tenus, or partly so, the trial court having had the advantage of hearing and observing the witnesses testify, great presumption is indulged in favor of the correctness of its conclusions." London Assur. v. Hendon, 30 Ala. App. 175, 2 So.2d 917, 918; Ala.Dig., Appeal and Error, ⊕931, and the Judge's conclusion will not be disturbed unless it is clearly wrong and unjust.

■ Under this rule the "findings of the trial court as to the value or amount of damages recoverable are, like the verdict of a jury, entitled to great weight, and, in the absence of an abuse of discretion, ordi-

narily will not be disturbed by the reviewing court". 5 C.J.S., Appeal and Error, § 1659, p. 749

In determining the correctness of the finding of fact of the trial court, "the reviewing court must consider all of the evidence in its most favorable aspect for the adverse party, and where there is evidence from which a reasonable inference may be drawn adverse to the complaining party, the court upon appeal will not disturb the lower court's conclusions." Skipper v. Wright & Colquett, 30 Ala.App. 409, 6 So. 2d 896, 897.

The evidence on the issues involved here was conflicting and made a case for the trier of facts, and applying these well known principles to the evidence in this case, we are of the opinion there was no error in the court's action in rendering judgment for plaintiff nor in overruling the motion for a new trial based on the ground that the judgment was contrary to the great weight of the evidence.

The judgment of the trial court is affirmed.

Affirmed.