681 So.2d 1040 (1995)
AMERICAN PIONEER LIFE INSURANCE COMPANY and Jerry Curtis, a Vice President of American Pioneer
v.
Freddy J. WILLIAMSON.
1921796.
Supreme Court of Alabama.
June 23, 1995.
Rehearing Overruled November 22, 1995.
*1041 Stanley A. Cash and Walter J. Price III of Huie, Fernambucq & Stewart, Birmingham, for Appellants.
W. Michael Atchison and Jeffrey E. Friedman of Starnes & Atchison, Birmingham, for Appellee.
Kenneth Wallis, Montgomery, for Amicus Curiae Association of Alabama Life Insurance Companies.
Jack Drake of Drake & Pierce, Tuscaloosa, and Bruce McKee of Hare, Wynn, Newell & Newton, Birmingham, for Amicus Curiae Alabama Trial Lawyers Association.
COOK, Justice.
The defendants appeal from a judgment based on a jury verdict awarding $250,000 in compensatory damages and $3,000,000 in punitive damages to Freddy J. Williamson on his breach of contract and fraud claims against American Pioneer Life Insurance Company and Jerry Curtis, a vice president of American Pioneer. We affirm conditionally.
Freddy Williamson contracted in 1984 with American Pioneer Life ("APL") to sell its life insurance products, and he did so until early 1988, when the managing general agent for Alabama, as well as Williamson, were terminated for "lack of production." Williamson contacted APL in April 1988, and began selling again for APL in May of that year. He was terminated on April 13, 1989, again for lack of production. On April 25, 1989, APL wrote Williamson a letter notifying him that APL was invoking the "forfeiture of commissions" provision of his contract and that, pursuant to that provision, Williamson would no longer be entitled to receive commissions on insurance policies already in place. APL stated in its letter to Williamson that it was invoking the forfeiture provision because Williamson had replaced a client's APL policy with an insurance product from another insurance carrier.
Williamson's contract with APL provided the following regarding vested commissions:
"If this Contract is terminated by the Company or the Managing Sales Representative, or should the Managing Sales Representative die or become totally disabled while this Contract is in force, he, or in the case of his death, his heirs or legal representatives shall, except as hereinafter provided in this Contract, receive commissions *1042 that occur under the provisions of this Contract, if any. Such renewal commissions shall terminate when the total renewal commissions so payable are less than $300.00 anually."
Plaintiff's Exhibit Number 3.
The insurance contract further provided for the forfeiture of commissions, as follows:
"Forfeiture of Commissions
"Should you at any time, withhold Company funds, create fraud, malfeasance, or induce or attempt to induce policyholders of the Company to lapse, replace, or otherwise terminate their policies, or if your license is terminated for cause by the Insurance Department of any state, the Company shall terminate your right to all commissions or other compensation thereafter payable under this Contract or under any prior contract, and shall terminate this Contract as well as any other contracts then in force."
The client whose policy was replaced was Michael Carroll. Upon notification that Carroll's policy had been replaced, and without investigating the replacement, Karen Klein of APL wrote Williamson the following letter:
"It has come to our attention that you are replacing policies and according to your contract under `Forfeiture of Commissions', we are terminating your right to all commissions or other compensation payable under your contract.
"If you have any questions regarding this matter, please contact either Mr. Al Parent, Treasurer, or me."
R. 593.
Williamson sued APL and Curtis, alleging breach of contract and fraud. The jury found in favor of Williamson and awarded compensatory damages of $250,000 and punitive damages of $3,000,000. The court entered a judgment based on that verdict. APL and Curtis appealed, contending that the trial court had erred in submitting the fraud count to the jury and, in the alternative, arguing that the judge should have ordered a remittitur of the $3,000,000 punitive damages award.[1]
In Southern Farm Bureau Life Insurance Co. v. Mitchell, 435 So.2d 745 (Ala. Civ.App.1983), the Court of Civil Appeals stated:
"We note that as a general proposition, an insurance agent has no inherent right to receive renewal premium commissions. Any such right accruing to him depends solely and strictly on the terms of his contract with the company he represents. Southern States Life Insurance Co. v. Allan, 38 Ala.App. 467, 87 So.2d 439 (Ala.Ct. App.1956)."
435 So.2d at 747. This Court must look to the contract between Williamson and APL to determine under what conditions Williamson was entitled to receive renewal commissions and under what conditions those commissions would be forfeited.
"To prove fraud, a plaintiff must allege and prove each of the following elements: 1) a false representation of 2) a material fact, 3) which was relied upon by the plaintiff, 4) who was damaged 5) as a result of his reliance. Ala.Code 1975, § 6-5-101. When promissory fraud is alleged, two additional elements must be proved: 1) that the misrepresentation was made with a present intent to deceive and 2) that, at the time the misrepresentations were made, the defendant intended not to perform. Leisure American Resorts, Inc. v. Knutilla, 547 So.2d 424 (Ala.1989) (citing Selby v. Quartrol Corp., 514 So.2d 1294 (1987); and Coastal Concrete Co. v. Patterson, 503 So.2d 824 (Ala.1987))."
Standard Furniture Mfg. Co. v. Reed, 572 So.2d 389, 391 (Ala.1990). With regard to "promissory fraud" and the element of "present intent to deceive," we have written:
"[T]his Court has often recognized that intent to deceive is an issue `peculiarly *1043 within the province of the trier of facts.' Hodges v. Pittman, 530 So.2d 817, 819 (Ala.1988). See, also Super Valu Stores, Inc. v. Peterson, 506 So.2d 317 (Ala.1987); and Southeastern Properties, Inc. v. Lee, 368 So.2d 288 (Ala.1979). Nonetheless, this Court has written:
"`"`unless the plaintiff puts forth some proof that there was something more than a failure to perform, something upon which a jury could infer that at the time the promise was made the defendant had no intention of performing, it is error to submit a fraud claim to the jury.'"'

Hodges v. Pittman, supra, at 819 (quoting Martin v. American Medical International, Inc., 516 So.2d 640, 642 (Ala.1987), quoting other cases)."
Standard Furniture Mfg. Co., 572 So.2d at 392.
The forfeiture provision in Williamson's contract stated that any attempt on Williamson's part to induce a policyholder to replace an existing APL policy would result in the forfeiture of commissions. In support of his fraud claim, Williamson offered evidence tending to show that Carroll had initiated the replacement of his policy and that Carroll's decision to replace it was not, in any way, influenced by Williamson. Williamson also offered the following testimony from Al Parent, APL's treasurer:
"Q. What does the term `replace' mean to you?
"A. The term `replace' to me, would mean to take one item and substitute another.
"Q. To American Pioneer, in the context of this forfeiture clause, the word `induce' and the word `replace' are synonymous, aren't they, Mr. Parent?
"A. Yes, sir.
"Q. Do you have a dictionary, sir?
"A. Not with me, no.
"Q. Do you understand that a `synonym' means that two words mean the same thing?
"A. Yes, sir.
"Q. I've got here a definition of `induce' from Webster's 9th edition; do you see that?
"A. Now that you're closer, yes.
"Q. Let me give you a copy of it so you can see it. Jeff, would you give him a copy?
"Mr. Friedman: Yes.
"Q. (By Mr. Atchison) Do you have it there, sir?
"A. Yes, sir.
"Q. Okay. `Induce,' make sure I'm reading it right. `Induce, inducing,' I'll skip the Latin there. I'll begin with `1. To move by persuasion or influence.' Did I read that right?
"A. Yes, sir.
"Q. Tell this jury what evidence American Pioneer had on April 25th, 1989, that Fred Williamson had moved by persuasion or influence to cause Michael Carroll to do something?
"A. We had a replacement notice.
"Q. Had a replacement notice. Did you have a single other thing?
"A. I am not sure that we did, but I believe that form stood on its own.
"Q. Okay.
". . . .
"Q. Did American Pioneer ever tell its agents, like Freddy Williamson, that it was going to use the term `induce' as a synonym to the word `replace'?
"A. No, sir.
"Q. So what you're telling us is, and you correct me if I'm wrong. What you really meant to say was, `Should you at any time replace, then you're going to lose your premiums'?
"A. Yes, sir.
"Q. Did y'all have lawyers help you draw this up?
"A. I believe so.
"Q. Did you ever give any notice to any agent that what you really meant was *1044 `replace' and not `induce' or `attempt to induce'?
"A. What do you mean by notice?
"Q. Writing, telephone calls, seminar, mailout, like we saw the mailout where you talked about AM Best, things like that.
"A. None that I can specifically refer to."
R.T. 412-17.
"A. [Parent:] The replacement form has to stand on its own. We cannot be present when the transaction is going on. The agent has a vested interest, if you will, in making sure that he gets a new first-year commission. There is a real tangible consideration in an agent replacing policies. That clause is in there to protect the company.
"Q. I thought it was in there to protect the policyholder. Is it to protect the company?
"A. Protect the company. That's a contract between the company and the agent.
"Q. So when American Pioneer decided to make `induce' be `replace,' it was doing that to protect itself?
"A. Yes, sir."
R.T. 472-73.
Williamson, therefore, offered evidence at trial tending to show that APL entered into a contract with Williamson knowing that if he replaced a policy, APL would consider him to have induced the replacement, without any investigation whatever. The contract clearly states that an agent will forfeit commissions only if the agent induces someone to change policies. No clause in the contract addresses replacement of policies in regard to which no inducement has occurred. Therefore, Williamson offered sufficient evidence of fraud to warrant the court's submitting Williamson's fraud claim to the jury.
APL contends that the trial court erred in refusing to order a remittitur of the $3,000,000 punitive damages award. We agree, and we condition our affirmance upon the plaintiff's accepting a $1,000,000 reduction of the punitive damages award.
"Subject to important state constitutional constraints, this Court has the authority under § 12-22-71, Ala.Code 1975, to determine the proper amount of recovery and to affirm the judgment, subject to the filing of a remittitur of the amount in excess of the proper amount, when the Court concludes that the judgment is excessive. The right to a trial by jury is a fundamental, constitutionally guaranteed right, Art. I, § 11, Const. 1901, and a jury verdict may not be set aside or remitted unless the verdict is flawed, thereby losing its constitutional protection, Hammond v. City of Gadsden, 493 So.2d 1374, 1378 (Ala.1986), or unless, in the case of a punitive damages verdict, it exceeds the amount necessary, in the particular circumstances of the case, to accomplish society's goals of punishment and deterrence, Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).
". . . .
"... When excessiveness of punitive damages is the issue, the focus of our review is not on the plaintiff's injuries, but, rather, is on the reprehensibility of the defendant's conduct. General Motors Corp. v. Johnston, 592 So.2d 1054, 1063 (Ala.1992). In compliance with the procedures mandated by Hammond and Green Oil, the inquiry is whether the amount of punitive damages awarded exceeds the amount necessary to accomplish society's goals of punishment and deterrence. Green Oil, 539 So.2d at 218."
Sears, Roebuck & Co. v. Harris, 630 So.2d 1018, 1033-34 (Ala.1993).
We have carefully studied the record in this case. We have independently applied the following factors approved by the United States Supreme Court in Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 21-22, 111 S.Ct. 1032, 1044-45, 113 L.Ed.2d 1 (1991):
"`(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, *1045 and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.'"
(As quoted in Northwestern Mutual Life Insurance Co. v. Sheridan, 630 So.2d 384, 394 (Ala.1993)). We note again the following comments regarding punitive damages:
"Because the purpose of punitive damages is not to compensate the plaintiff but to punish the wrongdoer and to deter the wrongdoer and others from committing similar wrongs in the future, the proper amount of punitive damages rests largely within the jury's discretion. However, although punitive damages need bear no particular relationship to actual damages, they, nonetheless, must not exceed an amount that will accomplish society's goals of punishment and deterrence. Maryland Casualty Co. v. Tiffin, 537 So.2d 469 (Ala. 1988); City Bank of Alabama v. Eskridge, [521 So.2d 931 (Ala.1988)]; Roberson v. Ammons, 477 So.2d 957 (Ala.1985)."
Green Oil Co. v. Hornsby, 539 So.2d 218, 222 (Ala.1989).
Although the plaintiff attempted at trial to offer evidence that 12 other agents had forfeited commissions under similar circumstances, the trial court directed a verdict for APL with regard to Williamson's "pattern and practice" allegations against APL.[2] Williamson offered no evidence regarding the individual circumstances of the 12 instances; particularly, he offered no evidence of the similarities and differences as compared to this case. Although it directed a verdict with regard to the pattern and practice allegations, the trial court stated the following in its order denying the motion for remittitur:
"This Court has considered the duration and repetition of the conduct, the defendants' awareness of the misleading policy and of the difficulties which the defendants' conduct caused for those such as the plaintiff. APL repeated its conduct by virtue of the fact that its representative testified she had been involved in `approximately twelve' similar cancellations of vested renewal commissions as the one involving Mr. Williamson."
The court, at its Hammond hearing, should not have considered those 12 instances as evidence of "similar past conduct."[3] Furthermore, in its order the trial court did not address the financial position of APL. We note that APL contends that a punitive damages award of $3,000,000 would severely hamper the company's ability to meet its obligations to its insureds. This case went to trial in 1993. In support of the $3,000,000 punitive damages award, Williamson argues that in 1992 APL's total assets were valued at $49,787,497 and that the company had just over $7,000,000 in surplus cash reserves. Assuming these figures are correct, the punitive damages award equals approximately 6% of the total assets of APL and approximately 40% of the surplus cash held in reserve by APL in 1992. For comparison purposes, the $25,727,248 verdict in Northwestern Mutual Life Insurance Co. v. Sheridan, 630 So.2d 384 (Ala.1993), was remitted to $12,863,624). The verdict in Northwestern (representing less than 1% of Northwestern's assets) was in favor of an insured; the verdict in this case was in favor of an agent of the insurer, who undisputedly had approximately 15 *1046 years' experience in the insurance business and had contracted with over 30 insurance companies during that time.
With these factors in mind, coupled with the fact there have been no other civil awards against APL for the same conduct and no criminal sanctions for its conduct, this Court concludes that the jury's verdict of $3,000,000 "exceeds the amount necessary... to accomplish society's goals of punishment and deterrence. Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989)." Sears, Roebuck & Co. v. Harris, 630 So.2d at 1034. Thus, the judgment of the trial court is affirmed, conditioned on Williamson's filing in this Court, within 28 days of the release of this opinion, a remittitur of $1,000,000 of the punitive damages award, reducing that award to $2,000,000.
AFFIRMED CONDITIONALLY.
MADDOX, ALMON, SHORES, and INGRAM, JJ., concur.
BUTTS, J., concurs in the result.

On Application for Rehearing
COOK, Justice.
APPLICATION OVERRULED.
ALMON, SHORES, INGRAM, and BUTTS, JJ., concur.
MADDOX, J., dissents.
MADDOX, Justice (dissenting).
On original deliverance, I concurred in this Court's conditional affirmance of the trial court's judgment. On application for rehearing, the defendants raise several issues, most of which were raised and addressed in the opinion on original deliverance, with the exception of one issue that was raised for the first time in the application for rehearing. That issue is whether the provisions of § 8-8-10, Ala.Code 1975, dealing with the accrual of interest on a judgment for the payment of money damages, should be applied, and, if applied, whether its application would violate the defendants' constitutional rights.
In overruling the application for rehearing, the Court does not address this issue, apparently on the ground that the issue should have been raised in the appellant's initial brief on appeal. I believe that the Court errs in that regard.
In my opinion, the defendants have presented a meritorious argument on this issue. On the question whether the issue should have been raised earlier, it must be remembered that this Court only conditionally affirmed the lower court judgment. Second, the amount of post-judgment interest, which in this case could be as much as $500,000, was not considered by this Court, as I recall, in its Hammond-Green Oil[1] review, and I believe that it should be.
I first address whether interest should be allowed on the punitive damages award. Several courts have held that pre-judgment interest on punitive damages awards may not be recovered, and the rationale for that holding applies equally to post-judgment interest. The Supreme Court of Massachusetts has held:
"The damaged party is entitled to a return on the money that the party would have had but for the other party's wrongdoing. To give the damaged party more than that would go beyond the purpose of the statute. The purpose behind the prejudgment interest statute is not to penalize the wrongdoer, or to make the damaged party more than whole."
McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 717, 563 N.E.2d 188, 196 (1990) (citations omitted). The Supreme Court of Alaska has also stated:
"Prejudgment interest is in the nature of compensation for use by [the] defendant of money to which [the] plaintiff is entitled from the time the cause of action accrues until the time of judgment. It is not meant to be an additional penalty."
Haskins v. Shelden, 558 P.2d 487, 494 (Alaska 1976).
*1047 In this case, while the plaintiff may be able to recover interest for the amount that he claims that the defendant did not pay him, i.e., interest on the compensatory award, the punitive damages award does not represent money owed to the plaintiff, and the amount of that penalty is not final until after this Court's review. The Texas Court of Appeals recognized the differing purposes of compensatory and punitive damages, as follows:
"We conclude that equitable considerations cannot justify an award of pre-judgment interest in the present case. We reached this conclusion because the purpose of pre-judgment interest and [punitive] damages are incompatible. The paramount purpose of awarding [punitive] damages is not to compensate the plaintiff, but to punish and set an example for others. By contrast, pre-judgment interest is not intended to punish the defendant's misbehavior. We conclude, therefore, that because [punitive] damages do not compensate, pre-judgment interest on them is not necessary to make a plaintiff whole."
Granite Construction Co. v. Mendoza, 816 S.W.2d 756, 766 (Tex.App.1991) (citations omitted).
I also think that this Court should revisit the question of the excessiveness of the award. The plaintiff has filed a brief in opposition to the application for rehearing in which he states that "[f]ollowing the reduction of the punitive damages award, the [award] equalled approximately 4% of American Pioneer's 1992 total assets." (Emphasis added.) However, the record indicates that at the time of the Hammond-Green Oil hearing in the trial court in the spring of 1993, the defendant's net worth was $7,280,211. The reduced award, coupled with the interest that has accrued, is approximately $2.75 million, which represents approximately 38% of the defendant's net worth.
There is another reason for revisiting the question of excessiveness of the punitive damages awarded. Since the release of this Court's original opinion, I have read a transcript of the oral arguments made by the parties in the Supreme Court of the United States relating to BMW of North America, Inc. v. Gore, 646 So.2d 619 (Ala.1994), cert. granted, ___ U.S. ___, 115 S.Ct. 932, 130 L.Ed.2d 879 (1995), in which the Court is examining, once again, Alabama's practice regarding the award of punitive damages. See, Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Based on the nature of the questions asked by the Justices at oral argument in the BMW case, and based on my reading of the holdings in Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), Haslip, supra, TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), and the more recent case of Honda Motor Co., Ltd. v. Oberg, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994), I believe that the judgment of this Court results in an unconstitutional taking of Pioneer Life's property; therefore, I must respectfully dissent, unless the Court orders a remittitur of all but $250,000 of the punitive damages award.
The jury in this case, it appears to me, has compensated the plaintiff for the harm he suffered, and the maximum punitive damages award that I would permit would be $250,000, because there does not seem to be clear and convincing evidence that the defendants engaged in a pattern and practice of misconduct that would justify more than that amount.
NOTES
[1] APL and Curtis raised two other issues on appeal. This Court has considered the appellants' arguments in regard to those other issues and finds them to be without merit. Those issues will not be discussed in this opinion.
[2] This case was tried before the release of Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993), wherein this Court held unconstitutional § 6-11-21, Ala.Code 1975, the statutory cap on punitive damages. Under § 6-11-21, claims supported by evidence of a "pattern and practice" with regard to fraudulent conduct provided an exception to the $250,000 cap on punitive damages and allowed a plaintiff to receive more that that amount.
[3] Although the trial court directed a verdict with regard to the "pattern and practice" allegations, the court's order denying the remittitur motion suggests that the trial judge did consider Williamson's "pattern and practice" evidence in denying the remittitur.
[1] See Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986); Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).