704 So.2d 1361 (1997)
AMERICAN PIONEER LIFE INSURANCE COMPANY and Jerry Curtis
v.
Freddy J. WILLIAMSON.
1921796.
Supreme Court of Alabama.
September 5, 1997.
Stanley A. Cash and Walter J. Price III of Huie, Fernambucq & Stewart, Birmingham, for appellants.
W. Michael Atchison and Jeffrey E. Friedman of Starnes & Atchison, Birmingham, for appellee.

On Remand from the United States Supreme Court
COOK, Justice.
This case is on remand from the United States Supreme Court for reconsideration of the punitive damages award in light of BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). On original deliverance, this Court affirmed a compensatory award for Freddy Williamson against American Pioneer Life Insurance Company and its employee Jerry Curtis in the amount of $250,000 and affirmed a punitive *1362 damages award against American Pioneer and Curtis conditioned on Williamson's acceptance of a reduction of that award from $3,000,000 to $2,000,000. See American Pioneer Life Ins. Co. v. Williamson, 681 So.2d 1040 (Ala.1995). On remand, we re-affirm the compensatory award; we also re-affirm the punitive damages award, but, upon our reconsideration of that award in light of the United States Supreme Court's opinion in BMW, we condition our affirmance on the plaintiff's acceptance of a further reduction of the punitive damages award to $750,000.
In BMW, supra, the jury awarded $4,000 in compensatory damages and $4,000,000 in punitive damages against BMW for fraudulently failing to disclose to Dr. Ira Gore that the BMW automobile he was purchasing had been repainted. On appeal, this Court ordered a reduction of the $4,000,000 punitive award to $2,000,000. See BMW of North America, Inc. v. Gore, 646 So.2d 619 (Ala. 1994). The United States Supreme Court vacated our $2,000,000 judgment, partly because that Court concluded that BMW had not received "fair notice not only of the conduct that [would subject it] to punishment but also of the severity of the penalty that [this] State [would] impose." 517 U.S. at 574, 116 S.Ct. at 1598. The Supreme Court also cited three guideposts a court should use to scrutinize a punitive damages award for excessiveness: the degree of reprehensibility; the ratio between the punitive damages award and the compensatory damages award; and a comparison of the punitive damages award to the civil or criminal penalties that could be imposed for comparable misconduct. 517 U.S. at 574-576, 116 S.Ct. at 1598-99.
The first and most important factor to be considered is the degree of reprehensibility of the conduct of the defendant. Considering this factor helps ensure that the punitive damages award is not "`grossly out of proportion to the severity of the offense.'" 517 U.S. at 576, 116 S.Ct. at 1599. The second factor to be considered is the ratio of the punitive damages award to the harm inflicted. 517 U.S. at 580, 116 S.Ct. at 1601. In setting out this factor, the Supreme Court was quick to state that it has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." 517 U.S. at 582, 116 S.Ct. at 1602, citing TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443 at 458, 113 S.Ct. 2711 at 2720, 125 L.Ed.2d 366 (1993). The Supreme Court pointed out that the ratio of punitive damages to actual damages in BMW was 500 to 1. 517 U.S. at 583, 116 S.Ct. at 1603. This ratio, coupled with the fact that "there [was] no suggestion that Dr. Gore or any other BMW purchaser was threatened with any additional potential harm by BMW's nondisclosure policy," resulted in an unjustified great disparity between the actual damages and the punitive damages awarded. 517 U.S. at 582, 116 S.Ct. at 1602. A third critical factor to be considered with regard to the question of excessiveness is the potential imposition of criminal or civil penalties for comparable misconduct. 517 U.S. at 583, 116 S.Ct. at 1603. The Supreme Court determined that the maximum statutory civil penalty in Alabama for violations similar to those committed by BMW was $2,000, leaving much disparity between the civil penalty and the $2,000,000 punitive damages award sanctioned by this Court in its first opinion in this case.
In the BMW case, on remand from the United States Supreme Court, we addressed the concerns of that Court as follows:
"We point out that, in providing three guideposts by which to review the excessiveness of a punitive damages award, the majority in BMW did not dismiss the review process already established by this Court in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and upheld by the United States Supreme Court in Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Indeed, the first two `guideposts' are already included in a Hammond-Green Oil review; the first consideration of the review is the relationship *1363 of the amount of the punitive damages award to the harm that the defendant's action has caused or is likely to cause, and the second consideration is the degree of reprehensibility of the defendant's conduct.
"Moreover, in his special concurrence in BMW, Justice Breyer discussed the Green Oil factors as a means of reasonable constraint upon arbitrary and fundamentally unfair punitive damages awards. Joined by Justices O'Connor and Souter, Justice Breyer specifically stated that the factors of the Hammond-Green Oil review may make up for the lack of significant statutory constraint against excessive punitive damages awards in Alabama. 517 U.S. at 587, 116 S.Ct. at 1605. It was not the Green Oil factors themselves, but this Court's application of them in this case that Justice Breyer found objectionable.
"Thus, as we read the BMW opinion, the United States Supreme Court's guideposts are not intended to exclude judicial consideration of other factors that might bear on the question of excessiveness; this Court has considered other such factors for some years. We see the three guideposts as factors to be emphasized in a judicial review of a punitive damages award pursuant to Hammond, Green Oil, and Ala.Code 1975, § 6-11-23(b). In sum, the United States Supreme Court's BMW decision seems to hold that the presumption of validity Alabama extends to a jury verdict must yield to a more meaningful judicial review of that verdict when it is challenged by a tortfeasor as excessive."
BMW of North America, Inc. v. Gore, 701 So.2d 507, 509 (Ala.1997) (BMW II).
With regard to the requirement that a defendant have notice of the conduct that will result in a large punitive damages penalty, as well as knowledge of the severity of that penalty, we wrote on remand:
"Until the United States Supreme Court released its decision in BMW, it was generally assumed that a statute stating that intentional fraud would subject a tortfeasor to such punitive damages as a jury might assess in a fair trial was sufficient notice of the severity of the punishment that might be inflicted. The Supreme Court held in BMW that `[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose.' 517 U.S. at 574, 116 S.Ct. at 1598. The Supreme Court cited only criminal cases in support of this proposition and acknowledged that `[t]he strict constitutional safeguards afforded to criminal defendants are not applicable to civil cases.' 517 U.S. at 574 n. 22, 116 S.Ct. at 1598 n. 22. However, the Court went on to state that `the basic protection against "judgments without notice" afforded by the Due Process Clause, Shaffer v. Heitner, 433 U.S. 186, 217, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (Stevens, J., concurring in judgment), is implicated by civil penalties.' 517 U.S. at 574 n. 22, 116 S.Ct. at 1598 n. 22 (emphasis original). The Court concluded that each of the three guideposts (the reprehensibility of BMW's conduct, the ratio of the punitive damages award to the compensatory damages award, and comparison with applicable civil and criminal sanctions) indicated to it that BMW did not receive adequate notice of the magnitude of the sanction that Alabama might impose on it for its misconduct.
"The Supreme Court's decision in BMW now requires that state courts reviewing jury verdicts challenged as violating the federal Due Process Clause determine whether the tortfeasor had adequate notice that the conduct for which the jury found him liable could subject him to punishment. Due process also requires, and state courts must now determine, whether the tortfeasor had adequate notice of the severity of the penalty that might be imposed for the activity he engaged in.
"Alabama, by statute, provides notice concerning the conduct that will subject one to punitive damages in this state. Ala. Code 1975, § 6-11-20, expressly sets forth and defines the acts, as well as the state of mind:
"`(a) Punitive damages may not be awarded in any civil action, except civil *1364 actions for wrongful death pursuant to Sections 6-5-391 and 6-5-410, other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff. ...
"`(b) As used in this article, the following definitions shall apply:
"`(1) FRAUD. An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury.
"`(2) MALICE. The intentional doing of a wrongful act without just cause or excuse, either:
"`a. With an intent to injure the person or property of another person or entity, or
"`b. Under such circumstances that the law will imply an evil intent.
"`(3) WANTONNESS. Conduct which is carried on with a reckless or conscious disregard of the rights or safety of others.
"`(4) CLEAR AND CONVINCING EVIDENCE. Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.
"`(5) OPPRESSION. Subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights.'
"(Emphasis added [in BMW II].)
"Alabama, by providing a judicial review of punitive damages, provides notice of the range of amounts of punitive damages a defendant may expect to pay for conduct described in § 6-11-20. This Court refined the elements of judicial review for excessiveness of jury verdicts in 1989 by adding specific Green Oil factors to the Hammond review. We have reviewed the published opinions since that time in which this Court and the Court of Civil Appeals have affirmed awards of punitive damages, excluding wrongful death cases, and the five cases now here on remand from the United States Supreme Court.* These opinions show that the overall application of the Hammond-Green Oil review by the Alabama judiciary has imposed a substantial restraint upon arbitrariness in punitive damages awards and also has provided notice of the amount of punitive damages a jury might impose.* * Thus, § 6-11-20, in conjunction with the sizable body of case law supplementing it, serves as clear notice to all of the action Alabama deems sufficiently reprehensible to warrant an award of punitive damages and the level to which a defendant may be punished for such conduct. All who would conduct activities in Alabama are presumed to know its laws. Barber Pure Milk Co. v. Alabama State Milk Control Bd., 275 Ala. 489, 156 So.2d 351 (1963).
* The United States Supreme Court also remanded these four cases for reconsideration along with BMW: Life Ins. Co. of Georgia v. Johnson, 684 So.2d 685 (Ala.1996); Sperau v. Ford Motor Co., 674 So.2d 24 (Ala.1995); Union Security Life Ins. Co. v. Crocker, 667 So.2d 688 (Ala.1995); and American Pioneer Life Ins. Co. v. Williamson, 681 So.2d 1040 (Ala.1995).
* * Out of the more than 100 published opinions dealing with punitive damages since 1989, when the Green Oil review was implemented, fewer than 10% have affirmed punitive damages awards that still exceeded $2 million after appellate review. In several of those cases where the punitive damages award affirmed exceeded $2 million, the large amount of the compensatory damages awards indicated a level of misconduct that would clearly justify an unusually high punitive damages award. See Duck Head Apparel Co. v. Hoots, 659 So.2d 897 (Ala.1995) ($4,350,000 compensatory damages and $15,000,000 punitive damages); Sears, Roebuck & Co. v. Harris, 630 So.2d 1018 (Ala.1993), cert. denied, 511 U.S. *1365 1128, 114 S.Ct. 2135, 128 L.Ed.2d 865 (1994) ($850,000 compensatory damages and $2.5 million punitive damages). In approximately 50% of the published opinions, the punitive damages award affirmed was $100,000 or less, and in approximately 80% the punitive damages award affirmed was $1 million or less."
BMW II, 701 So.2d at 510 - 511.
On remand in BMW II, this Court ordered a remittitur of the punitive damages award from $2,000,000 to $50,000. As we did in that case, we will now reevaluate the punitive damages award in this present case in light of the United States Supreme Court's decision in BMW and our subsequent opinion in BMW II on remand. The facts of this case, as stated in our earlier opinion, are as follows:
"Freddy Williamson contracted in 1984 with American Pioneer Life (`APL') to sell its life insurance products, and he did so until early 1988, when the managing general agent for Alabama, as well as Williamson, [was] terminated for `lack of production.' Williamson contacted APL in April 1988, and began selling again for APL in May of that year. He was terminated on April 13, 1989, again for lack of production. On April 25, 1989, APL wrote Williamson a letter notifying him that APL was invoking the `forfeiture of commissions' provision of his contract and that, pursuant to that provision, Williamson would no longer be entitled to receive commissions on insurance policies already in place. APL stated in its letter to Williamson that it was invoking the forfeiture provision because Williamson had replaced a client's APL policy with an insurance product from another insurance carrier."
American Pioneer Life Ins. Co. v. Williamson, 681 So.2d 1040, 1041 (Ala.1995). According to the evidence, the forfeiture-of-commissions clause was invoked without any investigation on the part of APL to determine if Williamson had "induced" the client to replace the APL policy. 681 So.2d at 1043-44. The forfeiture-of-commissions clause invoked by APL read:
"Should you at any time, withhold Company funds, create fraud, malfeasance, or induce or attempt to induce policyholders of the Company to lapse, replace, or otherwise terminate their policies, or if your license is terminated for cause by the Insurance Department of any state, the Company shall terminate your right to all commissions or other compensation thereafter payable under this Contract or under any prior contract, and shall terminate this Contract as well as any other contracts then in force."
See 681 So.2d at 1042. (Emphasis added.) After his commissions were terminated, Williamson sued APL, alleging breach of contract and fraud. He was awarded compensatory damages and punitive damages.
First, we will consider the degree of reprehensibility of APL's conduct. This factor was cited by the United States Supreme Court in BMW as perhaps the most important factor for a court to consider when reviewing an award for excessiveness. The degree of reprehensibility is also one of the Green Oil factors. Green Oil Co. v. Hornsby, 539 So.2d 218 at 223 (Ala.1989). In considering the reprehensibility of APL's conduct, we note that the damage suffered by Williamson was economic and did not endanger his health or safety.
"Although the BMW Court stated that certain inflictions of economic injury would warrant a `substantial penalty,' 517 U.S. at 576, 116 S.Ct. at 1599, it does appear to regard torts causing only economic injury as less worthy of large punitive damages awards than torts inflicting injuries to health or safety."
Continental Trend Resources, Inc. v. OXY USA Inc., 101 F.3d 634 (10th Cir.1996). Here, the economic harm was the forfeiture of commissions on insurance policies that Williamson, an obviously experienced insurance agent, was to receive as he continued to service policies already in place. Because Williamson was no longer actively selling policies for APL, his commissions from APL would, no doubt, have declined over time, even if the forfeiture provision had not been invoked. In addition, although Williamson argued at trial that APL had treated 12 other agents similarly with regard to forfeiture of commissions, the trial judge directed a verdict for APL as to Williamson's "pattern and practice" allegations. American Pioneer *1366 v. Williamson, 681 So.2d at 1045. The granting of the directed verdict is not challenged on appeal. Certainly, the degree of reprehensibility of APL's actions would be seen as much greater if Williamson had proven that American Pioneer had treated other agents similarly. We find that APL's actions against Williamson were reprehensible enough to justify a punitive damages award; however, considering APL's conduct in light of the guideposts set out in BMW, we conclude that the $2,000,000 punitive damages award merits further reduction.
Next, we compare the punitive award to the compensatory award. This second guidepost set out in BMW is also a Green Oil factor. The originally remitted punitive award of $2,000,000 is 8 times the $250,000 compensatory damages award. The United States Supreme Court, in BMW, reiterated that there is no exact mathematical formula for determining when a punitive damages award is excessive. 517 U.S at 582, 116 S.Ct. at 1602. We, too, have rejected the adoption of a mathematical formula:
"Although it is difficult to determine case by case what ratio of punitive damages to compensatory damages is excessive, we reject the easy answer of adopting one ratio that would apply to all and would therefore give a wrongdoer precise notice of the penalty that his misconduct might incur. To do so would frustrate the purpose of punitive damages, which is to punish and deter a defendant's misconduct. A ratio that could be deemed reasonable in many cases might well be insufficient in cases where the defendant has reaped great profit from its conduct, or where its conduct is particularly reprehensible."
BMW II, 701 So.2d at 513. However, considering the low degree of reprehensibility in this case, the 8:1 ratio suggests a further reduction would be appropriate.
In our original opinion in this case, we noted that "in 1992 APL's total assets were valued at $49,787,497 and that the company had just over $7,000,000 in surplus cash reserves". American Pioneer, 681 So.2d at 1045. Any punitive damages award should remove any profit realized by APL as a result of its misconduct. Any punitive damages award should also sting a company with assets valued at just under $50,000,000 ($7,000,000 of which is held in surplus cash reserves), but should not prevent APL from meeting its obligations to its insureds. APL's financial position or its ability to pay a large award should not, however, result in an affirmance of an unjustified award "simply because the defendant has the ability to pay it." BMW II, 701 So.2d at 514. The $2,000,000 punitive award originally affirmed in this case constitutes approximately 4% of APL's net worth, but 28% of its cash reserves. In our original opinion, we stated:
"For comparison purposes, the $25,727,248 verdict in Northwestern Mutual Life Insurance Co. v. Sheridan, 630 So.2d 384 (Ala.1993), was remitted to $12,863,624. The verdict in Northwestern (representing less than 1% of Northwestern's assets) was in favor of an insured; the verdict in this case was in favor of an agent of the insurer, who undisputedly had approximately 15 years' experience in the insurance business and had contracted with over 30 insurance companies during that time."
American Pioneer Life Ins. Co. v. Williamson, 681 So.2d 1040 (Ala.1995). While APL could, no doubt, pay the $2,000,000 award without significant hardship, its actions were not nearly as reprehensible as the misconduct in Northwestern Mutual Life Insurance Co. v. Sheridan. The comparison of the two cases supports a further reduction of the $2,000,000 award.
In our original opinion, we also observed that "there have been no other civil awards against APL for the same conduct and no criminal sanctions for its conduct."[1] 681 So.2d at 1046. While the existence of other civil awards or criminal sanctions for the same conduct as existed in this case could support a remittitur, the evidence does not establish that there has been any other civil or criminal punishment for APL's conduct here.
Despite the fact that the record does not suggest an amount relating to the cost of litigation, we recognize that litigation costs *1367 are high in protracted cases such as this one. Nevertheless, "where other Green Oil factors do not support a large punitive damages award, substantial litigation costs borne by the plaintiff will not alone justify the award." BMW II, 701 So.2d at 514.
Considering all of the foregoing factors, we make the following observations and findings: A reduction of the punitive damages award from $2,000,000 to $750,000 would leave an award more than adequate to remove any profit realized by APL as a result of its actions. A $750,000 award would represent approximately 1% of the net worth of APL at the time of the wrongful conduct. A $750,000 punitive damages award, in our opinion, would also make APL very reluctant to repeat its conduct in the future and, thus, would thereby meet the objective of encouraging deterrence of future wrongful conduct. Green Oil, 539 So.2d at 222. A $750,000 award would represent approximately 11% of APL's cash surplus reserves and would not, in our opinion, impair APL's ability to conduct business with its insureds. By reducing the $2,000,000 punitive award to $750,000, the ratio of punitive damages to compensatory damages is reduced from 8:1 to 3:1, which is in line with the degree of reprehensibility discussed above. That portion of the judgment based on the jury award of $250,000 in compensatory damages is affirmed. The punitive damages award is affirmed, conditioned on Williamson's filing a remittitur of that award to $750,000 within 28 days of the release of this opinion; if he does not file such a remittitur within that time, the judgment will be reversed and this cause will be remanded for a new trial.
AFFIRMED IN PART; AFFIRMED CONDITIONALLY IN PART.
SHORES and KENNEDY, JJ., concur.
HOOPER, C.J., and MADDOX, HOUSTON, BUTTS, and SEE, JJ., concur in the result.
HOUSTON, Justice (concurring in the result).
I concur in the result. See my special opinion in BMW of North America, Inc. v. Gore, 701 So.2d 507, 516 - 523 (Ala.1997) (Houston, J., concurring in the result).
HOOPER, C.J., and MADDOX and SEE, JJ., concur.
NOTES
[1] These are additional factors to be considered under Green Oil, 539 So.2d at 223-24.